THE STATE, DEFENDANT IN ERROR, v. HENRY JONES, PLAINTIFF IN ERROR.

Argued November 15, 1904—Decided March 6, 1905.

1. The trial judge, on an indictment for murder, instructed the jury that the right to take life in self-defence rested upon necessity; and that no one was justified in taking the life of another unless the necessity for doing so was apparent as the only means of preventing his own destruction, or of escaping grievous bodily harm. *Held,* that if, by the use of the word "apparent," the idea was conveyed to the minds of the jurors that the necessity must actually exist, rather than that it must reasonably appear to exist, and consequently the instruction was not an accurate expression of the abstract rule upon this subject, the inaccuracy could not have been harmful to the prisoner for the reason that the defence set up by him was that he took the life of the deceased in resisting an assault which the latter was committing upon him with a deadly weapon.

2. On the trial of an indictment for murder, where the justification is self-defence, it is entirely proper to instruct the jury that the burden is on the accused of proving, to the satisfaction of the jury, a situation and circumstances under which the right of self-defence might be lawfully exercised, provided they are also instructed that the accused is entitled to the benefit of the reasonable doubt upon the whole case.

On error to the Mercer county Court of Oyer and Terminer.

For the plaintiff in error, *John H. Backes.*

For the state, *William J. Crossley,* prosecutor of the pleas.

The opinion of the court was delivered by

GUMMERE, CHIEF JUSTICE. The plaintiff in error was convicted of the crime of murder of the first degree in the killing of one Elmer Durant. The homicide took place at the New Jersey state prison, of which institution both the deceased and the defendant were inmates at the time of Durant's death. The two occupied the same cell, together with another convict, one Giles. All three were colored men. Shortly

before the noon hour of March 5th, 1904, the three men re-
turned to their cell from the prison shops in which they had
been at work.  The deceased and the defendant, who were not
upon good terms, began to talk to one another in an abusive
manner.  Action followed words, and they finally came to-
gether in a desperate struggle, during which the deceased
called to Giles, "Help me, Jasper, he's cutting me!"  Giles
then pounded upon the door of the cell to attract attention
from the outside, and two keepers shortly appeared and sep-
arated the combatants.  Both were found to be seriously
injured.  The defendant was so badly cut that one of his
hands had to be amputated.  The deceased had received a
stab wound in the neck, which had severed the jugular vein,
and another in the body, which had penetrated to the heart,
and died in a few minutes.  The facts so far related are not in
dispute.  On the question of the responsibility for the affray,
the case made by the state (the testimony of Giles) was that
after the interchange of words between the deceased and the
defendant, the latter approached the deceased with a scissors
blade in his hand and stabbed him in the neck with this
weapon while he was in the act of arising from a cot upon
which he had been sitting.  According to the story told by
the defendant, the deceased was the aggressor.  His version
of the affray was that, after the exchange of words between
them they both rose from the cots upon which they had been
sitting; that the deceased put his hand in his pocket and
pulled out a scissors blade, which dropped to the floor; that
he (the defendant) rushed for and grabbed this scissors blade
to prevent the deceased from using it; that as he raised up,
after grasping the scissors blade, the deceased made an attack
upon him with a razor, which he had in the meantime drawn,
and that he (the defendant) then used the scissors blade in
repelling the attack made upon him by the deceased with the
razor.

The alleged errors, on account of which we are asked to
set aside this conviction, are all directed at the charge of
the court to the jury.  The first of these relates to the in-
struction of the court upon the law of self-defence.  The

court said: "This right [that is, the right to take life in self-defence] rests upon necessity, and no one is justified in taking the life of another unless the necessity for so doing is apparent, as the only means of preventing his own destruction or of escaping grievous bodily harm. The question of the existence of such necessity is not for the defendant, but for the jury; the jury must draw from all the circumstances the conclusion whether, from the situation of the parties at the time, it was necessary for the defendant to take the life of the deceased as the only means of saving his own life, or of avoiding grievous injury to his person." Counsel alleges that the latter part of this instruction is in direct opposition to two rules laid down by this court in the case of *State* v. *Bonofiglio,* 38 *Vroom* 239. The first of these rules is that a homicide done in resisting an attempt to commit robbery (or murder, or certain other crimes) was justifiable under section 110 of the Crimes act; that by virtue of the statutory provision referred to the person upon whom such an attempt was being made was not required to retreat, or to use other or less radical means than the killing of his assailant, to render such attempt abortive, even though such means might be resorted to with entire safety to himself, and would manifestly be successful. The second rule of the Bonofiglio case is that in the exercise of the right of self-defence a man may protect himself, even to the taking of the life of his adversary, when that act is, or reasonably appears to be, necessary to preserve his own life or to save himself from serious bodily harm.

The mere statement of the first of the two rules laid down in the Bonofiglio case suffices to show that the instruction complained of is in no way opposed to it. The one deals with the statutory right to take life in repelling an attempt to commit any one of certain crimes specified in the statute; the other with the right to take life in self-defence. The contention that the instruction is opposed to the second rule in the cited case is stated by counsel to rest upon this ground, namely, that "it imposed upon the accused the burden of establishing that the necessity for the homicide was actual

and real, and not merely apparent." It is not at all certain that the language of the trial judge justifies this criticism. He began his instruction on the subject by saying that "no one is justified in taking the life of another unless the necessity for doing so is apparent as the only means," &c., and then proceeds to say "the question of the existence of such necessity, &c.—that is, the necessity which is apparent as the only means, &c. The use of the word "apparent" in the charge was unfortunate, on account of its dual meaning. Counsel's contention, in effect, is that, as used in the charge, it must be construed as synonymous with actual, real; while counsel himself, in making this very contention, uses the same word as expressing a meaning in direct opposition thereto. It may be that in the collocation in which this word was used by the court it conveyed to the jury the meaning attributed to it by counsel; but if it did, and so gave them an erroneous idea of an abstract rule of law, it certainly could have done the defendant no harm. The case which was before them did not present for their determination the question of the right of a man to take life under circumstances where it was seemingly, but not actually, necessary to do so to preserve his own life, or to save himself from grave bodily harm. If the story told by the defendant was true, the necessity of doing what he did for his own protection was absolutely beyond question, and it was with this story that the trial judge was dealing in this part of his instruction to the jury, not with a mere abstraction. He was charging the *law of the case,* and, as the law of the case, this instruction was not objectionable.

The next subject of criticism by counsel is the following instruction of the court: "The question is whether the defendant has produced evidence of a character which raises a reasonable doubt of his guilt—a reasonable doubt whether he was not justified, in the defence of his life and limb, when he took the life of Durant." It is argued that by this instruction the jury were confined, in their deliberation upon the efficacy of the plea of self-defence, to a consideration of the evidence produced on behalf of the defendant, and were prohibited from considering evidence produced on the part of

the state which had a tendency to support this defence. But a reference to the charge discloses that the trial judge, just previous to the instruction which is challenged, was commenting upon the evidence produced upon the part of the defendant, in support of the issue made by him, that he had taken the life of the deceased in self-defence. On that issue the burden certainly rested upon him to produce evidence which would at least raise a reasonable doubt whether he was not justified in doing what he did. In truth, the burden was heavier than this. On the trial of an indictment for murder, where the justification is self-defence, it is entirely proper to instruct the jury that the burden is on the accused of proving, to the satisfaction of the jury, a situation and circumstances under which the right of self-defence might be lawfully exercised, provided they are also instructed that the accused is entitled to the benefit of the reasonable doubt upon the whole case. *Brown* v. *State,* 33 *Vroom* 666. In the present case that direction was given to the jury. Following the particular instruction now being considered, the trial judge charged the jury that "if you find that Jones was first attacked by Durant in such a way that, to save his own life, it was necessary for him to kill Durant, * * * the defence of self-defence is made out; and if there is a reasonable doubt in your mind whether this defence is made out, the defendant is entitled to the benefit of that doubt."

Another excerpt from the charge, which is alleged to be erroneous, is as follows: "Therefore, gentlemen, as a summing up of this topic of self-defence, I charge you that if you find beyond a reasonable doubt that Jones prepared for or provoked the affray, he cannot successfully set up the plea of self-defence." The error is said to be in the use of the disjunctive in the clause "prepared for *or* provoked the affray." It is contended that by this instruction the jury were told, in effect, that if they should conclude from the evidence that the defendant had prepared for the affray, but had subsequently abandoned his intention, and was in nowise responsible for Durant's attack upon him, they must, nevertheless, find that he was not justified in protecting himself.

It may. be that, standing alone, the instruction is susceptible to this criticism; but when the portion of the charge from which it was taken is examined, this criticism falls.  The instruction was rested upon a supposed finding by the jury "that after the quarrel which had taken place between Jones and Durant in the morning [it appeared in the case that there had been a quarrel between these two some hours before the homicide] each armed himself, one with the scissors blade and the other with a razor, and, after they got in the cell, hot words led to a mutual fight—a fight for which both were ready and into which both entered."  On such a finding of fact, the legal rule charged by the court was entirely accurate.

Objection is also made to the following instruction to the jury: "If you find beyond a reasonable doubt, going outside of the matter of self-defence, that Jones premeditatedly, deliberately and willfully prepared for the use of the scissors blade, and used it in pursuance of that design, the degree of his criminality is murder in the first degree."  The criticism upon this part of the charge is that it requires the jury to convict of murder in the first degree, even though the intent to take life was not present.  An examination of this instruction shows the presence of an ellipsis.  "In pursuance of that design" plainly refers to something antecedent.  That antecedent is not in the excerpt itself.  An examination of the charge shows that this particular instruction is immediately preceded by a statement that, to constitute murder in the first degree, there must be a settled, deliberate and premeditated intent to kill, followed by the execution of that intent.  Reading the criticised excerpt in the light of what immediately preceded it, the instruction was that if the defendant premeditatedly, deliberately and willfully prepared for the use of the scissors blade, and used it in pursuance of that design (i. e.. the design to kill the deceased), the degree of his criminality was murder in the first degree.  That such is the legal rule prevailing in this jurisdiction is not controverted by the defence.

Other errors have been assigned to other parts of the charge, each one of which has received consideration from the

.court. They are not of sufficient importance to deserve special reference, and it is sufficient to state that we find each and every of them without merit.

The conclusion reached is that the judgment under review must be affirmed.

*For affirmance*—THE CHIEF JUSTICE, GARRETSON, PITNEY, SWAYZE, VREDENBURGH, VOORHEES, GREEN, GRAY.  8.

*For reversal*—THE CHANCELLOR, DIXON, GARRISON, BOGERT, VROOM.  5.