56 N.J. Super. 219 (1959)
152 A.2d 372
WILLIAM F. McANDREW, INDIVIDUALLY AND AS GUARDIAN AD LITEM OF ROBERT McANDREW, AN INFANT, AND FRANCES McANDREW, PLAINTIFFS-APPELLANTS,
v.
ANDREW MULARCHUK, SHIRLEY SIEGEL, TRADING AS CLUB MIAMI, AND BOROUGH OF KEANSBURG, A MUNICIPALITY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 26, 1959.
Decided June 22, 1959.
*221 Before Judges GOLDMANN, CONFORD and HANEMAN.
Mr. Prospero DeBona argued the cause for plaintiffs-appellants (Messrs. Milton, McNulty and Augelli, attorneys).
Mr. Joseph V. Cullum argued the cause for defendant-respondent (Messrs. Townsend and Doyle, attorneys).
The opinion of the court was delivered by CONFORD, J.A.D.
The action is brought to recover damages for and in consequence of a gunshot wound sustained by the minor plaintiff, Robert McAndrew (hereinafter referred to as plaintiff), who was 17 years of age at the time of the events which concern us. Although plaintiffs recovered verdicts aggregating $8,000 for compensatory and punitive damages against the defendant Andrew Mularchuk, they are aggrieved at the dismissal by the trial judge, on motion, of the claim as against the defendant municipality, Borough of Keansburg, and hence appeal. The correctness of that action is the principal issue before us. There was a verdict of no cause of action as against the defendant, Shirley Siegel, doing business as Club Miami. This is not here in issue.
Some time in the late evening (after midnight) of May 18, 1956 plaintiff and some other young men became involved in an altercation with the operator of a tow truck over his charge for towing the disabled car in which plaintiff and one of the lads, Charles Fordi, owner of the car, had driven to Keansburg from Jersey City that evening. The operator was insisting upon keeping the car keys until the *222 charge was paid; plaintiff and Fordi considered the $15 fee excessive and had insufficient money to pay it.
At the time, the defendant Mularchuk was serving as a reserve policeman of the City of Keansburg, specially assigned for the evening at the nearby Club Miami at the request of the club proprietor. He was in the company of David Carman, also a reserve police officer of the municipality, but doing regular patrol duty that day. Mularchuk was wearing a policeman's uniform and badge and carried a nightstick and gun. The attention of the policemen was drawn to the dispute by loud conversation and profane language. Mularchuk told the truck operator to take the automobile keys to police headquarters. Fordi protested, assertedly abusively, and Carman threatened to arrest him. Fordi said he wanted to go to headquarters and Carman seized him and brought him to a nearby police car, Mularchuk attending. Plaintiff followed, his testimony being that he was pleading with Mularchuk to release Fordi. Mularchuk's version is that plaintiff was swearing at and threatening him.
Plaintiff's testimony is that after the policemen threw Fordi into the car, Carman started after another of their companions and Mularchuk after him. He turned and ran but was hit in the back, about chest-high, by gunfire from Mularchuk's weapon. The latter testified that plaintiff came toward him with his hand in his pocket; that he feared he had a gun or a knife, and he drew his gun. He fired at the ground in front of plaintiff "to scare him off," but as he did so plaintiff turned and the bullet struck him in the back.
Plaintiff's treating physician testified that the bullet entered the body in the back at about the same level as that at which it emerged from the chest. Moreover, a passing motorist corroborated the essential details of plaintiff's version of the actual shooting.
Mularchuk was a "reserve" policeman of the Borough of Keansburg. He had been sworn in as such for 1956 in February of that year and had held such a position for *223 16 years. Apparently a reserve policeman is called on duty by the municipality whenever his services are specially required. Mularchuk had previously done traffic duty, served at parades, and patrolled in police cars. For such duty he was paid $1.25 per hour.
According to Police Chief McGrath, of the defendant borough, it was also customary for clubowners to have some one sworn in as a "special" policeman for duty in the clubs, to keep the peace, keep aisles and fire exits clear, etc. An owner normally nominated the person he wanted, and the borough officials would have him sworn. These men, as reserve policemen, were told not to carry weapons when they were not on duty. When working in a club they were not required to wear a uniform or carry a gun, but the chief did not object to their doing so.
On the night in question Albert Siegel, the manager of the Club Miami, telephoned Chief McGrath to ask if reserve officer Carman was available for duty in the Club Miami. Carman was on duty but McGrath said he would try to obtain Mularchuk. The policeman at the headquarters desk did reach Mularchuk and told him to go to Siegel's. He did so, first stopping at police headquarters, wearing his uniform and gun, and was given a ride in a police car to his place of duty. The borough did not pay the men for this type of work. Compensation was received from the owner. Mularchuk arrived at the Club Miami and stayed there until the bar closed at 2:00 A.M. It was as he left that he saw the disturbance, about 100 feet away from the bar, which led to the shooting.
There was other testimony, some of it in the form of depositions of the defendant Mularchuk, bearing upon his fitness and qualifications to serve as a policeman under arms and upon the claim of negligence of the municipality in engaging him therefor. This will be enlarged upon hereinafter.
The theory of the plaintiff's cause of action against Mularchuk was for an atrocious assault and battery, and, in the *224 alternative, for his negligence; against the municipality for his negligence on the basis of agency and for the municipality's direct negligence in engaging him and using his services.
At the conclusion of plaintiffs' case the defendant municipality moved for an involuntary dismissal, and consideration thereof was deferred by the trial judge until the end of the case. At the end of the entire case the trial judge dismissed the action against the municipality on the ground that the conduct of Mularchuk was such that, in order to hold the municipality liable for it in tort, there would have to be evidence of participation in the act by some municipal officer or agent higher up in the ranks of authority, and no such evidence appeared.

I.
Before taking up the various grounds of appeal we note the municipality's objection to the appeal as a whole, based upon the argument that plaintiffs are not aggrieved, having recovered for their damages against Mularchuk. But it is obvious that plaintiffs' right, if any, to recovery against the defendant municipality is a valuable substantive right in the absence of any showing that they have received full satisfaction for the judgment from the defendant Mularchuk. The point is not well taken.

II.
One of plaintiffs' principal points is that the trial court was in error in requiring a showing of direction of, or participation in Mularchuk's wrongdoing by some agent or officer sufficiently high in municipal authority to implicate the municipality itself as a participant. In effect, plaintiffs argue that recent cases have brought this jurisdiction to the position of adoption of the rule of respondeat superior in relation to the tort liability of municipalities for the *225 active wrongdoing of their agents or employees, even when functioning in a governmental capacity. They rely upon the recent analysis and application of these cases by the United States District Court in City of Newark v. United States, 149 F. Supp. 917 (D.C.N.J. 1957), affirmed on other grounds, 254 F.2d 93 (3 Cir. 1958), which held that the negligence of a City Hospital ambulance driver at a street intersection was imputable to the City so as to bar its tort action against the United States for the negligence of a mail truck driver. The principal reliance of the District Court judge for this conclusion was our own decision in Hartman v. City of Brigantine, 42 N.J. Super. 247 (App. Div. 1956), affirmed, as to the subject under consideration, on the opinion below, in 23 N.J. 530 (1957).
We are constrained to observe, however, that we did not intend to hold in Hartman, and do not believe the opinion was so understood by our Supreme Court, that respondeat superior implicates a municipality for the torts of its agents and employees in the same manner and to the same extent as private parties. The question was not critical there as we found that the participation in the wrongdoing by the county assistant road supervisor established the participation therein of the county, that officer having had general authority over the road project in the course of which the hazards there involved were created (42 N.J. Super. at pages 256, 257, 258). Other language in the opinion cited by the United States District Court in the Newark case, supra, was merely by way of treatment of the contention that the work involved was beyond the jurisdiction of the county or contrary to law (42 N.J. Super. at pages 255, 256).
Although one member of the court in Casale v. Housing Authority, City of Newark, 42 N.J. Super. 52, 63 (App. Div. 1956) (Judge, now Mr. Justice Francis), was prepared to apply respondeat superior to hold a municipality liable for the negligence of a maintenance man at a housing project in sweeping snow in such manner as to create an ice hazard, with resulting injury to the plaintiff-tenant, the majority *226 was able to demonstrate that our courts of highest authority had not overruled the requirement of direction or participation in the wrongful act by some officer or agent of the municipality having general authority to remedy or deal with the matter. This was one of the bases for the affirmance of a judgment in favor of the City. In Cloyes v. Delaware Tp., 23 N.J. 324, 330 (1957), the Supreme Court cited Casale with the observation that the requirement "that the municipality itself participated in the wrongful conduct" was "controversial," but without indicating that it was ready to abandon the rule to that effect. In Kelley v. Curtiss, 29 N.J. Super. 291 (App. Div. 1954), a showing of direction or participation by the municipality was, after thorough consideration of the authorities, held necessary to hold in the municipality for the negligent active wrongdoing of a police officer (leaving a horse unattended, the plaintiff sustaining a kick). Although reversed on another point, there was no disapproval in the Supreme Court of the holding referred to. 16 N.J. 265 (1954). See also Kress v. City of Newark, 8 N.J. 562, 573, 575 (1952); Taverna v. City of Hoboken, 43 N.J. Super. 160, 166 (App. Div. 1956).
We thus conclude that direction or participation by the municipality is still a requirement in this state for imposing liability upon it for the active wrongdoing of an employee, even in respect to such a governmental activity as Mularchuk was engaged in here for the borough. No one in this case argues that there was any evidence of such direction or participation by the defendant borough through the police chief or any one else insofar as the direct act of the shooting of plaintiff is concerned. Therefore the point argued will not sustain a reversal. In view of this conclusion we need not consider whether, under the principles discussed in Gindin v. Baron, 11 N.J. Super. 215 (App. Div. 1951), the borough would be absolved of liability on an agency basis anyway because of the assertedly intentional nature of the shooting by Mularchuk.

*227 III.
Plaintiffs rest on firmer ground when they argue, alternatively, that there was actionable wrongdoing participated in by the defendant borough, through the police chief, in permitting a person as ill-equipped in training as the evidence shows Mularchuk to have been, to perform police duties armed with a firearm.
First, the jury could have found from the evidence that the chief of police knew or reasonably should have known that Mularchuk would be armed with a loaded gun on his assignment that evening. Second, if the jury believed Mularchuk's testimony it could have found that his hitting plaintiff in the back while aiming at the ground was evidence of lack of adequate skill with the firearm. Moreover, there was a plenitude of evidence in the circumstances of the shooting, whatever version is credited, to have permitted the jury to conclude that Mularchuk was inadequately versed in the fundamental rules as to the conditions under which he would be justified in firing at or in the vicinity of the plaintiff. See State v. Williams, 29 N.J. 27 (1959); Noback v. Town of Montclair, 33 N.J. Super. 420 (Law Div. 1954); Davis v. Hellwig, 21 N.J. 412 (1956).
The responsibility of the defendant borough, through the police chief and predecessor officers in charge of the police department, for Mularchuk's inferable ineptitude, is clear. Mularchuk testified on depositions, which were introduced in evidence, that he had never received any training from the borough in the use of small arms; that he had no actual experience in the use of a .38 caliber Smith and Wesson weapon such as that he was using on May 19, 1956; that he was never examined by any borough official as to his proficiency with firearms; that his instructions from the police department were that he might use his weapon only "when your life is threatened" or "a holdup." He was instructed that he might use force to make an arrest in the event of resistance to arrest (when, or by whom, he received *228 such instructions he did not say), but it does not appear that he was informed of the distinction in that regard between persons suspected of misdemeanors or disorderly conduct and those charged with more serious offenses. See Davis v. Hellwig, supra (21 N.J. at pages 416, 417). Neither police chief McGrath nor any of his officers ever had instructed Mularchuk, to McGrath's knowledge, as to the circumstances under which he might use a gun. While McGrath had been chief only since 1952 yet a question of fact might reasonably exist as to whether there should not be a reexamination at intervals as to the qualifications for the handling of firearms of non-regular police officers.
If the inadequacy of Mularchuk's training was proximately related to the injury of the plaintiff, as a jury could have found, the employing municipality can be held for its own negligence in assigning him to police duties, armed with a gun, entirely without regard to the doctrine of respondeat superior. A question of fact was presented as to whether what actually transpired was a reasonably foreseeable consequence of the municipality's default. Wilson v. Brauer, 97 N.J.L. 482, 484, 485 (E. & A. 1922); cf. Mazzilli v. Selger, 13 N.J. 296 (1953); Kress v. City of Newark, supra. Any such negligence was participated in by the chief of police of the municipality and those who were in charge of the police department prior to his time, thereby bringing liability home to the municipality within the traditional requirements of direction or participation. There is no problem in finding the wrongdoing of the municipality to have been active, in line with such cases as Hartman v. City of Brigantine; Kelley v. Curtiss; and Casale v. Housing Authority, City of Newark, all supra.

IV.
The defendant borough submits a number of grounds of justification of the result at the trial, apart from the correctness of the reason for the dismissal assigned by *229 the trial court. These may be grouped under the general heading of ultra vires, illegality, or lack of authority for assigning Mularchuk, he being a reserve policeman, for special duty at a commercial place of entertainment. It is contended that the ordinance providing for reserve patrolmen calls only for such officers "to properly patrol and police the borough"; that the chief of police had no authority to permit Mularchuk to be assigned at a tavern, or to carry firearms; and that there were other irregularities in giving this assignment to Mularchuk. Whether or not these assertions are sound they are irrelevant to the issue before us. As we said in Hartman v. City of Brigantine, supra (42 N.J. Super. at page 256): "For purposes of tort liability it is generally sufficient that the municipal agents or employees are acting within the scope of their general duties, even if they are proceeding in an irregular manner or contrary to law." It was within the scope of the police chief's general duties to see to the maintenance of good order where crowds congregated, as the evidence indicates was the expected and actual situation at the Club Miami on the night in question. Any negligence on his part in assigning Mularchuk that night, or on the part of other municipal officials in qualifying Mularchuk for police duty so as to make him available for such an assignment, resulting in injury to a member of the public, is the inescapable responsibility of the municipality. Its liability is not to be evaded by the kind of technicalities here advanced.
Reversed and remanded for a new trial, but solely as between plaintiffs and the defendant Borough of Keansburg.