WILLIAM F. McANDREW, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF ROBERT McANDREW, AN INFANT, AND FRANCES McANDREW, PLAINTIFFS-RESPONDENTS, v. ANDREW MULARCHUK, *ET AL.*, DEFENDANTS, AND BOROUGH OF KEANSBURG, A MUNICIPALITY, DEFENDANT-APPELLANT.

Argued January 25, 1960—Reargued May 9, 1960—Decided June 28, 1960.

174

*Mr. Prospero DeBona* argued the cause for plaintiffs-respondents (*Messrs. Milton, McNulty & Augelli,* attorneys).

*Mr. Joseph V. Cullum* argued the cause for defendant-appellant, Borough of Keansburg (*Messrs. Townsend & Doyle,* attorneys; *Mr. Thomas F. Doyle,* of counsel).

*Mr. Fred G. Stickel, III,* argued the cause *amicus curiae* for the New Jersey Institute of Municipal Attorneys (*Mr. Thomas M. Kane,* of counsel).

The opinion of the court was delivered by

FRANCIS, J.  The infant plaintiff sued the Borough of Keansburg and Andrew Mularchuk to recover damages on account of a gunshot wound inflicted by Mularchuk, allegedly during the course of his duties as a reserve patrolman of the municipality. His mother and father joined as plaintiffs to present their claim for consequential losses. The action was predicated upon charges of atrocious assault and battery and negligence against the individual defendant; the borough's liability was based upon (1) negligence in authorizing and sanctioning the arming of Mularchuk with a dangerous weapon without having adequately trained and instructed him in its use, and (2) a claim that the doctrine of *respondeat superior* imposed responsibility for an unlawful or negligent shooting committed in the course of Mularchuk's duty as a reserve patrolman.

The trial court dismissed the action against the borough at the close of the trial on the ground that in the present state of the law any negligence of Mularchuk in shooting the plaintiff was not imputable to it under the principle of *respondeat superior,* and that the evidence had failed to disclose any independent negligence directly engaged in or chargeable to the municipality itself which would justify a recovery by the plaintiff. The Appellate Division reversed the dismissal and ordered a new trial. 56 *N. J. Super.* 219 (*App. Div.* 1959). It held that the proof was susceptible

of the inference that the borough itself, through its responsible officials in a sufficiently high echelon of authority, was guilty of active wrongdoing in allowing and directing a person untrained or inadequately trained in the handling and use of a revolver to engage in public police duties while carrying such a dangerous instrument. We granted certification because of the importance of the problem involved. 30 *N. J.* 600 (1959).

In 1926 Keansburg, by ordinance, established a police department to consist of a "Chief of Police, two Sergeants, and such number of regular and reserve patrolmen as may be necessary to properly patrol and police the Borough." Article 4 provided that "the Department shall be under the control of the Chief of Police, subject to the control, supervision and regulation as provided by the laws of this state." According to Mularchuk he was appointed a reserve patrolman under this ordinance around 1940 and reappointed annually thereafter (except for 1951 when he was designated as a "special" policeman) down to and including 1956. The formal resolution of the council for his 1956 reappointment was received in evidence. Upon appointment, Mularchuk took the oath of office and filed a bond in the amount of $2,500 conditioned upon the faithful performance "of all the duties enjoined upon him as Reserve Patrolman * * *." In the pretrial order the borough asserted that the first appointment occurred in 1946 but no proof was offered to that effect. The conflict is of no great moment. The parties stipulated that Mularchuk was legally appointed a reserve officer on January 3, 1956 "under the ordinance and the statutes." Authority to create the police department and to provide for reserve patrolmen is not questioned. See *R. S.* 40:47–1; *N. J. S. A.* 40:47–19.

Reserve officers were pressed into service by the chief of police when needed, and while on duty for the borough they were paid at the rate of $1.25 per hour. When called in, they engaged in regular patrol activity on foot and in police cars; they worked at election times (Mularchuk had been

on duty at the primary election, just shortly before the incident which forms the basis for this suit); on parade days; as bank guards (for which the borough paid them); and when on active police duty they were obliged to maintain order everywhere in the municipality. The evidence also reveals that, upon request to the chief of police, an operator of a place such as a night club who expected a crowd could obtain the assignment of a reserve patrolman for the evening to keep order on his premises. In such event, the indication is that the borough did not pay the officer his hourly wage. Apparently the club operator was expected to do so. Mularchuk said there was no fixed or agreed basis for payment in such cases; he accepted whatever gratuity was tendered to him. Keansburg, being a shore resort, is more active in the warm weather and during that period Mularchuk averaged about 16 hours of duty a week. Of course, he had regular employment also; he was produce manager of a local supermarket.

A reserve patrolman, when on duty, wore a regular police uniform; dark blue trousers, lighter blue shirt, and a police hat with a badge on it. He carried a nightstick and a .38-caliber Smith & Wesson revolver in a holster attached to a Sam Browne belt, and he wore a regular police badge on his shirt. Reservemen were required to furnish their own firearms and ammunition. They were not allowed to carry the guns when off duty. This accords with the statute. *N. J. S. A.* 40:47–19, *supra.*

When Mularchuk was first appointed by the borough neither the then chief of police nor any other police official nor any member of the governing body asked him if he had any experience in the handling of revolvers, or examined him orally or by any kind of test to ascertain his skill or lack of it with police small-arms. Nor did anyone give, or offer to give, or require that he have, any training with such arms. Throughout his entire period of yearly appointments, the situation remained the same. He was never given any education nor was he required to submit to any training

with respect to the revolver he carried. He did say he was instructed that the gun could be used if his life was threatened, or in a hold-up, and he was told that he could use force when an arrest was being resisted. Whether the latter advice meant that he was authorized to use his gun in the face of resistance to arrest was not explained at the trial.

██ At one point in the trial, counsel for the borough undertook to question the chief of police as to his knowledge of Mularchuk's proficiency in the use of a gun. An objection was interposed and sustained. On an issue of inadequate training or experience in the handling of firearms, such inquiry is relevant and should be allowed.

The evidence discloses that at the time of the shooting incident Mrs. Shirley Siegel was the owner of the Club Miami, a night club in Keansburg. During the day of Saturday, May 19, 1956, her husband, the manager of the Club, had telephoned the chief of police and requested that a policeman be assigned to his premises that night because he had engaged an extra band and expected a crowd. The chief agreed, and requested Mularchuk to undertake the assignment. Mularchuk put on his uniform, took his night stick and revolver, and went to police headquarters. From there, in accordance with what appeared to be the custom, he was driven in a police car to the Club. His duties there were to maintain order, prevent disturbances, keep the aisles clear, and to see that the law was observed, both inside and outside the premises and "anywhere in the Borough of Keansburg." Closing time was 2:00 A. M. on Sunday, and the evening passed uneventfully until then. Upon termination of the festivities there, Siegel closed up. Mularchuk stepped out onto the public sidewalk, and into this unfortunate event.

Plaintiff Robert McAndrew was 17 years of age and resided in Jersey City. On this day he and a friend, one Fordi, decided to drive in his (Fordi's) car to Keansburg. They arrived at about 10:00 P. M. and thereafter visited two night clubs, the last one being the Club Miami. They left

there at about 12:30 A. M. It was raining at the time, as it had been during the evening, and when Fordi was about five blocks away from the Club he undertook to make a U-turn and got stuck in the mud in the shoulder of the road. Thereafter, the services of a tow truck were obtained, seemingly through a call to police headquarters, and the car was put back on the roadway. The charge for the service was not only considered exorbitant by them but it was more money than they had. As a result they went back to the Club Miami with the tow truck driver, who had retained the keys to the car, to ascertain if some further money could be borrowed from friends who were still there. Two of the friends came out of the Club and all four, standing on the public sidewalk, undertook to bargain with the tow car driver about his charge. Apparently the discussion became heated and it was at this point that Mularchuk left the then closing Club. He was accompanied by David Carman, another reserve policeman of the borough, who had been assigned to active patrol duty on the beachfront that night. There is a dispute in the testimony as to whether Carman came out of the tavern with Mularchuk or met him on the street in front of it, but the conflict is of no particular significance, except perhaps on the general issue of credibility of the various witnesses. In any event, the officers intervened in the discussion between the tow car driver and plaintiff and his friends. According to McAndrew, the officers took hold of Fordi and started to walk him toward the patrol car; Carman then "cornered" another of the young men in a doorway. McAndrew said that at this juncture he suggested to the officers that they "forget the whole thing," but Mularchuk started after him with the nightstick in his hand. He became frightened and started to run. After proceeding a short distance along the sidewalk, he turned into the street and, when half way across, he was shot in the back by Mularchuk. The bullet entered his back in the scapula region and, except for some particles which remained lodged along the seventh rib, it came out through the chest in the nipple

area.  The right lung was collapsed and the seventh rib
was fractured.  According to some disinterested testimony,
when McAndrew fell to the street Mularchuk took him by
the collar of his coat and pulled him back to the gutter on
the Club side of the street.

Mularchuk's version of the circumstances leading to the
shooting was in conflict with that of the plaintiff and his
witnesses.  He said that as he and Carman were walking
Fordi and two of the other young men to the patrol car
and putting them in it, other young men were cursing at
them and using obscene language.  After they got the arrested
persons in the car, he saw McAndrew and two others walking
toward them.  He heard McAndrew say:  "Get that  *  *  *
and I'll cut his  *  *  *  throat."  He ordered McAndrew
to halt but the order was disobeyed.  Instead, plaintiff kept
coming toward him, putting his right hand into his pocket
as he did so.  Mularchuk "got scared" at this, drew his
gun and shot at the sidewalk "towards him to scare him off."
But as he fired, McAndrew turned, stepped off the curb,
took "two or three steps and fell in the street."  He did not
fire in the air because he was frightened and was not going
to take any chances.

It is uncontradicted that the infant plaintiff did not have
in his possession a knife, or a gun, or any other weapon.

The statement given to the prosecutor's office by Mularchuk
was somewhat at odds with his testimony.  He said, "When
I seen he wasn't going to stop, he turned around and he
started to head across the street.  So I pulled my gun out
and I shot at him.  When I did, when I shot at him, he
fell on the curb."  He said also that there was a car
parked across the street and he thought McAndrew was
going to run to the car and get a gun or a knife "because
he threatened to cut my throat."  So he fired a shot at
the running boy's legs.

It seems obvious that the jury did not regard Mularchuk's
defense as very substantial.  After the trial court dismissed
the claim against Keansburg, verdicts were returned against

him for the infant plaintiff for both compensatory and punitive damages and of compensatory damages for the parents. They remain unpaid. It is not suggested on this appeal that the borough has any liability in punitive damages.

■ Our review calls for consideration of two problems. *First:* viewing the proof in the light most favorable to the plaintiffs (as we are required to do in this type of appeal), does it create a factual issue for determination by the jury, within the doctrine of *Kelley v. Curtiss,* 29 *N. J. Super.* 291 (*App. Div.* 1954), reversed on other grounds 16 *N. J.* 265 (1954), as to whether the borough itself was guilty of such negligence as would render it liable to the infant plaintiff? *Second:* assuming that Mularchuk, an ordinary agent or servant of the municipality (as distinguished from one of such high echelon of general authority in the management or control of the police department that it could be said that action by him was action by the municipality) was guilty of negligence in shooting McAndrew, should the borough be held under ordinary principles of *respondeat superior?*

■ So much has been said in recent years concerning the subject of liability of municipalities for negligence that extended discussion is unnecessary. The present state of the matter in New Jersey can be summed up in this fashion. Complete immunity does not exist. Liability is imposed for injurious acts performed by a municipality in its governmental capacity when they constitute active wrongdoing. That is, when a person suffers an injury through a negligent act of commission, as distinguished from a negligent failure to act, an obligation to respond in damages is recognized. It is not necessary that the negligent act of commission be the most proximate or nearest in time in a sequence of causes to the injury sustained; it is sufficient if, in the sequence, there is such an affirmative wrongful act even though the cause nearest in the succession of causes may be a mere omission to act. *Hartman v. City of Brigantine,* 23 *N. J.* 530, 533 (1957); *Cloyes v. Delaware Tp.,* 23 *N. J.* 324, 329 (1957); *Taverna v. City of Hoboken,* 43 *N. J. Super.*

160, 165 (*App. Div.* 1956), certification denied 23 *N. J.* 474 (1957); *Kelley v. Curtiss, supra.*

But despite the fact that our courts have exhibited a "just readiness" to find active wrongdoing on the part of local government, *Hartman v. City of Brigantine, supra,* 23 *N. J.,* at *p.* 533, an anomalous aspect of the partial immunity doctrine has remained undisturbed. The existing qualification on liability for an act of commission is that the act must have been performed by the municipality itself, *i. e.,* that it was directed, or committed, or participated in, by an agent of such general or superior authority and responsibility as to justify the conclusion that the corporate entity itself had acted. *Hartman v. City of Brigantine,* 42 *N. J. Super.* 247, 256 (*App. Div.* 1956), affirmed 23 *N. J.* 530 (1957); *Casale v. Housing Authority, City of Newark,* 42 *N. J. Super.* 52, 57 (*App. Div.* 1956); *Kelley v. Curtiss, supra.* It has not been considered sufficient to warrant imposition of liability that an ordinary employee was guilty of the active wrongdoing. The doctrine has been described as "controversial," *Cloyes v. Delaware Tp., supra,* 23 *N. J.,* at *p.* 330; as "unsatisfactory," *Milstrey v. City of Hackensack,* 6 *N. J.* 400, 407 (1951); and as "injustice," *Casale v. Housing Authority, City of Newark, supra,* 42 *N. J. Super.,* at *p.* 61, but it stands as the present state of the law. Consequently, in the determination of this case we shall first deal with the question whether the proof shows a negligent act of commission on the part of an agent or agents of the borough high enough in the echelon of general authority in the administration of the police department to justify a finding by a jury that the borough itself committed or participated in the commission of the act.

In any discussion of the problem it must be accepted that Mularchuk, in his capacity as a reserve patrolman, does not have the status of such a high-ranking agent. Thus, under the existing law, absent some culpable involvement by a person of sufficiently superior rank to satisfy the test described, the *mere fact* of the negligent shooting of McAndrew

in the pursuit of duty would not furnish a basis for recovery against the municipality. But the evidence is not so limited.

The police department was created by ordinance and specifically placed under the control of the chief of police. Provision was made for the selection and appointment of such regular and reserve patrolmen "as may be necessary to properly patrol and police the Borough." Reserve patrolmen apparently were recommended by the chief of police and appointed by resolution of the governing body. These officers were regularly uniformed and authorized, either expressly or impliedly, to carry sidearms when on duty.

Mularchuk had been a reserve patrolman for many years and had carried a .38-caliber revolver in the course of his duties. There is ample proof to warrant the conclusion that when called in by the chief to police a night club (at the request of the operator thereof) where a crowd was expected on a particular occasion, he was acting as an agent of the borough during that tour of duty. The further conclusion is also justified that his status as such agent began when he donned the uniform, sidearm and badge in response to the call to duty and reported at headquarters, and continued thereafter until such time as it could be said reasonably that his official duties had ended. In this connection it may be noted that Mularchuk said that on this evening, while in uniform, his job included quelling disturbances that might occur anywhere in the borough as well as inside and in front of the night club to which he had been assigned.

Loaded revolvers are dangerous instruments. Their potentiality for infliction of serious injury is such that the law has imposed a duty to employ "extraordinary" care in their handling and use. *Davis v. Hellwig*, 21 *N. J.* 412, 416 (1956). And in the *Davis* case, this court quoted with apparent approval the *dictum* of Judge Cardozo in *Palsgraf v. Long Island R. Co.*, 248 *N. Y.* 339, 162 *N. E.* 99, 100, 59 *A. L. R.* 1253 (*Ct. App.* 1928) that:

"Some acts, such as shooting are so imminently dangerous to any one who may come within reach of the missile however un-

expectedly, as to impose a duty of prevision not far from that of an insurer." 21 *N. J.*, at *pp.* 415–416.

Moreover the Legislature, in recognition of the revolver's capacity for harm, has made it a crime for the ordinary citizen to carry one concealed about his person without a permit. The permit may be obtained only by written application to the chief of police of the municipality, or to the sheriff of the county where the applicant resides. If the chief or sheriff gives his approval after conducting an investigation, the matter must then be presented to a county judge of the county of residence, who makes some further inquiry as well as a check of the applicant's fingerprints, and if he is satisfied of the sufficiency of the application and the need of the individual to carry a revolver, he grants the permit. *N. J. S.* 2A:151–41, 44. Persons engaged in certain occupations, such as special policemen appointed by the governing body of any municipality, are excepted from the requirement. *N. J. S.* 2A:151–43(*d*). This enactment, as Justice Burling indicated in *Mazzilli v. Selger,* 13 *N. J.* 296, 300 (1953), reveals an awareness on the part of the lawmakers that serious consequences may ensue from the use of guns "especially in incompetent or unqualified hands."

Municipal entities must take cognizance of the hazard of sidearms. That knowledge casts an obligation on them when they arm or sanction the arming of reserve patrolmen for active police duty. The obligation is to use care commensurate with the risk to see to it that such persons are adequately trained or experienced in the proper handling and use of the weapons they are to carry. If the official in general authority in the police department sends or permits a reserve officer to go out on police duty without such training or experience, his action is one of negligent commission—of active wrongdoing—, and if an injury results from an unjustified (see, *State v. Williams,* 29 *N. J.* 27 (1959)) or negligent shooting by that officer in the course of performance of his duty, which is chargeable to the lack of training or experience, the municipality is liable. Although

there is no case in New Jersey directly in point, the rationale of *Kelley v. Curtiss, supra; Hartman v. City of Brigantine, supra; Kress v. City of Newark,* 8 *N. J.* 562 (1952); *Milstrey v. City of Hackensack, supra,* and *Taverna v. City of Hoboken, supra,* clearly supports that conclusion.

According to Mularchuk, in his entire period of service neither the governing body which appointed him annually by resolution nor the present or any predecessor chief of police ever made any inquiry as to his ability to use, or his experience with, a revolver. He was never given any instruction in handling or shooting it; he was never given or ordered to have any target practice. So far as the present record discloses, he was simply dispatched on occasions, such as the one which produced this unfortunate event, with a .38 revolver at his side, to engage in police duty which might at any time eventuate in the use of that gun. At one point in the examination of the police chief at the trial, counsel for the borough undertook to inquire into his knowledge of Mularchuk's proficiency with a gun. On objection, the court refused to permit the questions. This was erroneous; obviously such knowledge or lack of it bears upon the issue of the chief's negligence in sending Mularchuk out on duty carrying a lethal weapon.

That the borough must be deemed to have acted in the situation under consideration when the chief acted cannot be doubted. As *Kelley v. Curtiss, supra,* indicates, he was the person entrusted with administrative control of the department, and when he put a reserve patrolman on duty he stood squarely in the shoes of the municipality.

On the basis of the foregoing, two factors leading to the liability of the borough may be considered as having appeared in the case. First, there is evidence of lack of training of, or experience by Mularchuk with small arms. As has been said, full development of this aspect of the case was improperly prevented in the trial court. On retrial (to be ordered hereafter) all of the relevant proof on the subject should be received for jury consideration. Second, as a

matter of law it has been established that the action of the police chief in sending Mularchuk out on duty on the night in question was the action of the municipality itself. Remaining to be studied are (a) whether Mularchuk was negligent in shooting McAndrew, and (b) whether that negligence is chargeable to lack of adequate training or experience with his revolver.

Mularchuk had been instructed by his superiors that he could use his gun when his "life is threatened or in a hold-up" and that he could use force when arrest is resisted.

Mularchuk testified that just before the shooting McAndrew was walking toward him with two other men. While approaching, allegedly he was making threats, saying: "Get that * * * and I'll cut his * * * throat." The officer said McAndrew ignored an order to halt and a statement that he was under arrest, and kept coming, putting his right hand in his pocket as he did so. Mularchuk said he became frightened, drew his gun and fired "a warning shot" at the sidewalk "towards" McAndrew "to scare him off." As he did so, McAndrew, who was then 15 or 20 feet away, turned and was struck in the back by the bullet. He did not "fire at him"; he "fired in his direction."

If Mularchuk reasonably believed that he was in danger of bodily harm and reasonably believed that it was necessary in order to avert that harm to fire a warning shot (as distinguished from a shot to injure) in the direction of McAndrew and did not intend that the bullet should strike him, but it did strike him because of Mularchuk's lack of skill or training in handling the gun, a jury would be justified in finding liability on the part of the borough. *Cf. State v. Williams, supra,* 29 *N. J.,* at *p.* 40; *State v. Jayson,* 94 *N. J. L.* 467 (*E. & A.* 1920); *State v. Agnesi,* 92 *N. J. L.* 53, 58 (*Sup. Ct.* 1918); *State v. Jones,* 71 *N. J. L.* 543 (*E. & A.* 1905); *State v. Lionelli,* 93 *N. J. L.* 24 (*Sup. Ct.* 1919); *State v. Di Maria,* 88 *N. J. L.* 416 (*Sup. Ct.* 1916), affirmed 90 *N. J. L.* 341 (*E. & A.* 1917); *State v. Hocker,* 87 *N. J. L.* 13 (*Sup. Ct.* 1915). It follows also that if the

jury does not accept as credible the allegation of threats by McAndrew, or as reasonable that there was any need to fire a shot, the firing of the gun at the sidewalk in the direction of McAndrew as he approached or as he was running away, even to effectuate an arrest, would constitute negligence rendering the borough responsible if the wounding stemmed from lack of reasonable skill and training in handling the weapon.

In our neighboring State of New York cases are to be found supporting the view that the presence of such circumstances as exist in this case would visit liability on municipal government. In *Meistinsky v. City of New York,* 285 *App. Div.* 1153, 140 *N. Y. S.* 2d 212 (1955), affirmed 309 *N. Y.* 998, 132 *N. E.* 2d 900 (*Ct. App.* 1956), a police officer interrupted a hold-up and when only a few feet away fired five shots at one of the bandits, four of which struck one of the victims of the hold-up who was standing alongside the bandit. Some evidence of the officer's lack of training in small arms was introduced and a jury verdict against the city was sustained. In *McCrink v. City of New York,* 296 *N. Y.* 99, 71 *N. E.* 2d 419 (1947), the police officer involved was a known alcoholic, and as such troublesome and vicious. He had repeatedly been subjected to disciplinary action because of excessive use of alcohol. While off duty, but carrying his revolver pursuant to regulations, he shot two persons. In holding the city responsible, the Court of Appeals said:

"It follows that where, in circumstances such as those we are now considering, the retention of an employee may involve a known risk of bodily harm to others, the field in which that discretion may be exercised by the head of a department is limited. It is superseded by the duty to abate that risk if in related circumstances danger to others is reasonably to be perceived." 71 *N. E.* 2d, at *p.* 422.

Liability was predicated upon an unusual set of circumstances in *Dunham v. Village of Canisteo,* 303 *N. Y.* 498, 104 *N. E.* 2d 872 (*Ct. App.* 1952). On a windy, freezing day the police chief and a fire commissioner assumed charge

of a 76-year-old man who was found lying on the floor of the fire station, muttering incoherently and apparently suffering from cold and pain. The man was in fact suffering from a fractured hip and elbow. The two superior officers put him in a cell for 18 hours without procuring medical aid, and he contracted pneumonia and died. Medical testimony was introduced to the effect that the delay in procuring medical help probably contributed to the cause of death.

The borough suggests that these cases are distinguishable because a fairly recent statute in New York brought about a waiver of governmental immunity. That is true. But extinguishment of the bar did not create the liability; it simply made possible the enforcement of a right which had its origin in the common law. See, *Schuster v. City of New York*, 5 *N. Y. 2d* 75, 180 *N. Y. S. 2d* 265, 154 *N. E. 2d* 534, 538–539 (*Ct. App.* 1958). It must be remembered too that, as has been indicated, there is no municipal immunity in New Jersey at present for negligent acts of commission engaged in by agents or employees of general authority in the field of governmental activity out of which the injury arose. Thus, by reason of the statute referred to, New Jersey and New York stand on an equal footing with respect to the prosecution of causes of action arising out of active wrongdoing directed or participated in by the municipality itself.

A very recent Illinois case is worthy of note. In *Peters v. Bellinger*, 22 *Ill. App. 2d* 105, 159 *N. E. 2d* 528 (*App. Ct.* 1959), a police officer arrested a motorist allegedly for driving while intoxicated. While making the arrest, he struck the citizen with considerable force, causing the loss of an eye. It appeared that the officer had been employed on a trial basis for 30 days. He had been given no training. From the proof he appeared to be a person who had been involved in many street brawls and he had been convicted of grand larceny. No one had checked his record. A verdict against the city was sustained. As will be seen hereafter, a short time before this decision was announced the Supreme

Court of Illinois abandoned its earlier doctrine of immunity and adopted a theory of *respondeat superior* liability for the negligent conduct of ordinary employees of a governmental agency occurring during the course of their duties. *Molitor v. Kaneland Community Unit District No.* 302, 18 *Ill.* 2d 11, 163 *N. E.* 2d 89 (1959). As a result of the broad view of liability announced by the scholarly opinion in the *Molitor* case, it was not necessary in *Peters* to consider specifically whether the proof demonstrated active wrongdoing on the part of the governmental entity itself. We consider it plain, however, that such negligence appeared, in addition to the tortious conduct on the part of the policeman.

Further ramifications of the problem of liability of the municipality for its own active wrongdoing need not be explored. Enough has been said to demonstrate our agreement with the Appellate Division that a jury question was presented at the trial on the theory of active wrongdoing in which the borough participated through its chief of police. In our judgment, the needs of the present-day environment require us to move on to a consideration of the broader ground of responsibility of the municipality under the doctrine of *respondeat superior* for the negligent acts of commission of ordinary agents or employees perpetrated in the course and scope of their employment.

If the customary rule of vicarious responsibility of the principal or employer for the negligence of the agent or servant were applied in the present case, liability of the borough would come into being regardless of whether Mularchuk was trained or had experience in the reasonable handling of a revolver, if he was guilty of active wrongdoing in shooting McAndrew or if he intentionally shot him in the pursuit of his duty.

If Mularchuk fired at the sidewalk to warn or to effectuate the arrest of his purposed prisoner, without intending to hit him, but aimed so close or so inaccurately that the bullet either struck him directly or by ricochetting from the sidewalk, manifestly a finding of a negligent act of commission

would be justified. Also, on the facts, if in order to accomplish an arrest he intentionally shot and wounded McAndrew, he would be responsible in damages for his wrongful act. *Cf. State v. Williams, supra; Davis v. Hellwig, supra; Noback v. Town of Montclair*, 33 *N. J. Super.* 420 (*Law Div.* 1954).

There is perhaps no doctrine more firmly imbedded in the law than the principle that liability follows tortious wrongdoing and that employers or principals, individual or corporate, are responsible for that wrongdoing when committed by agents and employees acting within the scope of the employment. The concept of municipal immunity for the active wrongdoing or intentionally wrongful act of employees unless the employees occupy such a high standing of general authority as to justify the conclusion that the municipality itself was acting is in headlong collision with that basic rule. It has been described as a distortion of an otherwise well settled principle of law. *Repko, "American Legal Commentary on the Doctrines of Municipal Tort Liability,"* 9 *Law & Contemporary Problems* 214, 221 (1942). As has been indicated above, much understandable agitation has grown up for amelioration of its inequity.

The general thesis of municipal immunity traces back to the 1788 English case of *Russell v. The Men of Devon*, 2 *Term. Rep.* 667, 100 *Eng. Rep.* 359 (*K. B.* 1788). At that time "the idea of the municipal corporate entity was in a nebulous state and the action was in effect against the population of a whole county." The decision was predicated on lack of precedent to sustain the action, fear of a multitude of such actions and the absence of funds in the treasury to be used in payment of judgments arising out of tort claims. *Prosser, Torts* (2d ed. 1955); *"Municipal Tort Liability in Operation,"* 54 *Harv. L. Rev.* 437, 440 (1941). In such a situation Judge Ashurst, speaking for the Kings Bench in *Russell*, said, "that it is better that an individual should sustain an injury than that the public should suffer an inconvenience." 100 *Eng. Rep.*, at *p.* 362. How the courts

of the United States came to apply the sovereign immunity doctrine, according to Professor Borchard, "is one of the mysteries of legal evolution." *Borchard, "Government Liability in Tort,"* 34 *Yale L. J.* 1, 4 (1924). And, as the Supreme Court of New Mexico aptly put it:

"It is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, 'the King can do no wrong', should exempt the various branches of the government from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of government should be imposed upon the single individual who suffers the injury, rather than distributed among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs." *Barker v. City of Santa Fe,* 47 *N. M.* 85, 136 *P. 2d* 480, 482 *(Sup. Ct.* 1943), quoting from *Annotation* 75 *A. L. R.* 1196 (1931).

Almost 30 years ago the Yale Law Journal commented that "An overwhelming opinion throughout the world in favor of the assumption of community liability for the torts of public officers may be regarded as representing a growing moral conviction to which the courts should not remain impervious." *"Municipal Responsibility for the Torts of Policemen,"* 42 *Yale L. J.* 241, 244.

The almost universal criticism of the tort immunity of local government does not apply in its full vigor in New Jersey because it is one of the few states which employs the active wrongdoing qualification. *Casale v. Housing Authority, City of Newark, supra,* 42 *N. J. Super.,* at *p.* 60. Unfortunately, however, much of the remedial effectiveness of our broader rule is lost because of the restricted application of ordinary principles of agency and vicarious responsibility. *Repko, "American Legal Commentary on the Doctrines of Municipal Tort Liability,"* supra, at *p.* 224.

The responsibility of the master or principal for the negligent acts of a servant or agent, committed while performing his delegated tasks, has always existed in this State as a matter of public policy. One basis for the doctrine is that

it creates an incentive to be careful in the selection, instruction and supervision of such persons. And from the standpoint of the injured third person, the master is better able to bear the burden of the losses resulting from such tortious acts by absorbing them as an incident of the operation of his enterprise.

■ Our rule, which limits the liability of a municipality for negligent acts of commission to instances where the wrongdoer occupies such a position of general authority as to warrant the conclusion that the entity itself acted or participated in the action, is an anomaly. There is no reason in logic or in justice for holding the governing body when a police inspector may be found to have participated through negligent inaction in the active wrongdoing of a police officer (*Kelley v. Curtiss, supra*) or when a supervisory engineer participated in the negligent repair of a roadway by ordinary employees (*Milstrey v. City of Hackensack, supra*), and for exonerating it when the active wrongdoing of the police officer or road worker occurs in the pursuit of the employment, but is not accompanied by some concurring negligence of a high-ranking superior. The rule is so artificial and unjust that it constantly sends the courts in particular cases on a deep and liberal search through the facts to find some higher echelon employee who may be said to have participated in the negligent act of commission of the lower level employee. All corporate entities, governmental and otherwise, as artificial creatures accomplish their purposes through human agents. Subject to the requirement that the negligence must be active rather than passive, so long as the actual tortfeasor commits the wrong within the scope of his authorized duties, there is no persuasive reason in law or morality which should distinguish one servant or agent from another as a means of imposing liability on the municipal principal or master when no such requirement exists as to the ordinary corporation. We think it can be said with reasonable certainty that the public's willingness to assume the normally incidental costs of carrying out its enterprises

through municipal corporations is no less than its insistence that private corporations bear the costs of their business activities. See, *Green, "Freedom of Litigation* (III)," 38 *Ill. L. Rev.* 355, 378 (1944).

In order to achieve a proper result in a case such as the present one, it is not necessary to deal with the basic rule of governmental immunity, *i. e.,* that no liability to respond in damages exists except in cases of active wrongdoing. Our concern is to make that rule an effective instrument for the accomplishment of justice where innocent persons are injured through the special kind of negligence which imposes liability. This can be done only by eliminating the distinction between the type of agent whose negligence will bring about municipal liability and the type whose negligence will vicariously make the ordinary corporate employer responsible. In our judgment, the time and the social necessity for bringing the rules into harmony have arrived. Accordingly, we hold that where negligent *acts of commission* form the basis of the claim against a municipal corporation, the issue of obligation to respond in damages shall be determined on general principles of *respondeat superior.* All earlier cases to the contrary may no longer be considered as the law of the State.

The borough argues that any such change should come about, if at all, by action of the Legislature. But the limitation on the normal operation of *respondeat superior* was originally placed there by the Judiciary. Surely it cannot be urged successfully that an outmoded, inequitable, and artificial curtailment of a general rule of action created by the judicial branch of the government cannot or should not be removed by its creator. See, *Smith v. Brennan,* 31 *N. J.* 353 (1960); *Collopy v. Newark Eye and Ear Infirmary,* 27 *N. J.* 29 (1958); *Woods v. Lancet,* 303 *N. Y.* 349, 102 *N. E. 2d* 691, 694, 27 *A. L. R. 2d* 1250 (*Ct. App.* 1951). As the Supreme Court of Washington observed in *Pierce v. Yakima Valley Memorial Hospital Ass'n,* 43 *Wash. 2d* 162, 260 *P. 2d* 765, 774 (*Sup. Ct.* 1953), judicial and

not legislative action closed the courtroom doors, and the same hand can, and, in proper circumstances should, reopen them.

Recently, in *Hargrove v. Town of Cocoa Beach*, 96 *So. 2d* 130 (*Fla. Sup. Ct.* 1957), the Supreme Court of Florida discarded the entire rule of municipal immunity from liability for wrongful acts committed by police officers in the exercise of their duties and adopted the principle of *respondeat superior* responsibility. The court said, among other things:

"The immunity theory has been further supported with the idea that it is better for an individual to suffer a grievous wrong than to impose liability on the people vicariously through their government. If there is anything more than a sham to our constitutional guarantee that the courts shall always be open to redress wrongs and to our sense of justice that there shall be a remedy for every wrong committed, then certainly this basis for the rule cannot be supported." 96 *So. 2d*, at *p.* 132.

In answer to the *stare decisis* argument, it continued:

"Judicial consistency loses its virtue when it is degraded by the vice of injustice.
We therefore now recede from our prior decisions which hold that a municipal corporation is immune from liability for the torts of police officers. Affirmatively we hold that a municipal corporation may be held liable for the torts of police officers under the doctrine of respondeat superior." 96 *So. 2d*, at *p.* 133.

In the past year the Illinois Supreme Court likewise abandoned the immunity rule, saying that it "is unjust, unsupported by any valid reason, and has no rightful place in modern day society." *Molitor v. Kaneland Community Unit District No.* 302, *supra,* 163 *N. E. 2d,* at *p.* 96. The result was considered controlling in *Peters v. Bellinger, supra,* involving a tortious assault by a police officer in the course of an arrest.

It must be pointed out that in the Florida and Illinois cases not only was the basic immunity rule abandoned but the principle of vicarious liability for both passive and active negligence was established as well. As we have endeavored

to make plain herein, it is not necessary in this case to re-evaluate the present rule in this State which immunizes municipal government against claims for injuries or damage resulting from the failure to act or from acts of omission of its agents. Nor does our decision here affect, except in one particular, the long existing rule which imposes responsibility only in cases of active wrongdoing, *i. e.*, negligent acts of commission, caused or participated in by agents of the municipality having general authority to act in the matter. Our holding eliminates the distinction between levels of authority of the agents or servants guilty of the active wrong-doing and requires the issue of liability to be determined by whether the negligent actor was functioning in the ordinary course of his official duty, that is, under the doctrine of *respondeat superior* as it applies to all corporate entities.

Some examples of active wrongdoing on the part of a police officer which resulted in vicarious responsibility on the part of the municipality may be helpful. *Benway v. City of Watertown*, 1 *A. D. 2d* 465, 151 *N. Y. S. 2d* 485 (1956), involved a rather unusual set of circumstances. The father of decedent turned his son's pistol over to the police for safekeeping. He told them his son had no permit for it and had threatened his wife's life with it. Some time later the police returned it to the son who shot his wife and killed himself. In holding that the complaint by the injured wife stated a cause of action, the Appellate Division said:

"In light of the facts alleged regarding knowledge of the defendant's police officers as to the circumstances under which the police came into possession of the pistol, the *act* of returning the weapon to plaintiff's husband might well be a negligent act for which the municipality should be held liable. * * * This *affirmative act* is not an omission to exercise a governmental function." 151 *N. Y. S. 2d*, at *p.* 487. (Emphasis ours)

In *Fields v. City of New York*, 4 *N. Y. 2d* 334, 175 *N. Y. S. 2d* 27, 151 *N. E. 2d* 188 (*Ct. App.* 1958), a motorist was

involved in a collision which the police officer did not see but did hear. On hearing cries of "hit and run" he started to follow the motorist who, a short time thereafter, stopped suddenly because a front tire had blown out. The pursuing police car, being unable to stop, struck the rear of the other vehicle. The motorist jumped out and started to run; the officer called "Stop," and three seconds later fired a shot which killed him. Proof was offered to show that the bullet ricochetted off the disabled car and struck decedent in the head. After pointing out that leaving the scene of an accident is not a felony and so provides no justification for shooting, the court found a jury question present as to the liability of the officer and the city. See also, *Lubelfeld v. City of New York,* 4 *N. Y.* 2d 455, 176 *N. Y. S.* 2d 302, 151 *N. E.* 2d 862 (*Ct. App.* 1958); *Flamer v. City of Yonkers,* 309 *N. Y.* 114, 127 *N. E.* 2d 838 (*Ct. App.* 1955); *Wilkes v. City of New York,* 283 *App. Div.* 724, 127 *N. Y. S.* 2d 853 (*App. Div.* 1954), affirmed 308 *N. Y.* 726, 124 *N. E.* 2d 338 (1954); *McCarthy v. City of Saratoga Springs,* 269 *App. Div.* 469, 56 *N. Y. S.* 2d 600 (*App. Div.* 1945); *Peters v. Bellinger, supra.*

In summary we hold that the record reveals evidence of active wrongdoing on the part of Mularchuk in the wounding of McAndrew. We further conclude that in the present state of the proof the borough may be found liable for that shooting on the theory of personal active wrongdoing in authorizing Mularchuk, when on duty, to carry a revolver without any training or adequate training in its handling and use, or under the doctrine of *respondeat superior* for the negligent act of commission of Mularchuk, or his wrongful intentional act in shooting McAndrew, committed during the course and scope of his police duty.

For the reasons stated, the judgment of the Appellate Division directing a new trial is affirmed.

BURLING, J. (concurring). I concur in the result, generally for the reasons expressed by the Superior Court, Appellate

Division, in section III of the opinion by Judge Conford below. 56 *N. J. Super.* 219, 227–228 (*App. Div.* 1959).
BURLING, J., concurring in result.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For reversal*—None.