91 N.J. Super. 233 (1966)
219 A.2d 873
ELSIE GILDAY, PLAINTIFF-RESPONDENT,
v.
LUCILLE L. HAUCHWIT, DEFENDANT, AND ALFRED G. HAUCHWIT, DEFENDANT-APPELLANT-RESPONDENT, AND PETER CARLO AND THE BOARD OF COMMISSIONERS FOR THE CITY OF PASSAIC, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 4, 1966.
Decided May 9, 1966.
*235 Before Judges GAULKIN, LABRECQUE and BROWN.
Mr. Brian J. McGrievy argued the cause for Alfred G. Hauchwit as appellant and respondent (Messrs. Evans, Hand, Evans, Allabough and Amoresano, attorneys; Mr. John W. Hand, of counsel).
*236 Mr. A. Leo Bohl argued the cause for respondents and appellants Peter Carlo and the Board of Commissioners for City of Passaic.
Mr. William M. Friend argued the cause for respondent Elsie Gilday (Messrs. Friend, Friend and Martin, attorneys; Mr. Israel Friend, of counsel).
The opinion of the court was delivered by LABRECQUE, J.A.D.
Defendants Alfred G. Hauchwit, Peter Carlo and the Board of Commissioners for the City of Passaic (Passaic) appeal from a judgment in favor of plaintiff following a jury verdict.
On May 2, 1963 plaintiff, while crossing East Main Avenue at the intersection of Washington Place, Passaic, was struck by an automobile operated by defendant Hauchwit as the latter made a left turn from Broadway (a continuation of Washington Place). The traffic lights at the intersection were allegedly not working at the time and traffic was being directed by defendant Carlo, a city policeman. The weather was clear, the roads were dry and it was still light.
Mrs. Gilday testified that when she arrived at the northeast corner of the intersection traffic was moving on East Main Avenue and she waited until she received a signal from Carlo to go ahead before starting to cross. As she was walking on the crosswalk, and had reached a point about six feet from the opposite side of the street, the Hauchwit automobile, which was in the process of making a left-hand turn, came at her. Although she quickened her pace to try to get out of the way, she was struck. She was severely injured and the quantum of the verdict in her favor is not in issue.
Plaintiff testified that after she had been signalled to cross, and when she was halfway across East Main Avenue, Carlo turned his back to her. Hauchwit testified that Carlo looked "over his shoulder" before signalling him to make a left-hand turn. Carlo had no recollection of having signalled *237 plaintiff to cross or of being aware of her presence prior to the accident.
The trial judge denied motions for involuntary dismissal made at the close of plaintiff's case and, again, after all parties had rested. The liability of all three defendants was then submitted to the jury in a charge which precluded a finding against Passaic unless the jury found that Carlo was guilty of active wrongdoing or negligent commission. McAndrew v. Mularchuk, 33 N.J. 172, 181, 193 (1960); Allas v. Rumson, 115 N.J.L. 593, 595 (E. & A. 1935). The jury subsequently requested and received further clarification as to the meaning of the terms negligent commission and omission.
Thereafter the jury returned a verdict that:
"We, the jurors, find in favor of the plaintiff, Mrs. Gilday, and against the defendants, Hauchwit, and Officer Carlo and the City of Passaic to the total sum of $17,000, Mr. Hauchwit $10,000, Officer Carlo, guilty of commission, $7,000."
The jury was then polled. The finding against Hauchwit was unanimous. Eleven jurors voted to hold Carlo, and the finding against Passaic had the support of ten of them.
The trial judge, on motion, molded the verdict to provide for judgment:
"In favor of the plaintiff and against the defendants in the sum of $17,000."
Motions for a new trial were denied.
Defendants Carlo and Passaic urge that (1) their motions for involuntary dismissal and for judgment in their favor were improperly denied; (2) the evidence did not and could not support a finding that defendant Passaic, through defendant Carlo, was guilty of active wrongdoing; (3) their motions for a new trial were erroneously denied, and (4) the trial judge's molding of the verdict was in error.
Defendant Hauchwit also challenges the verdict, urging that the jury's attempt to apportion the damages between *238 defendants rendered the verdict an illegal one which could not be molded by the trial judge into an enforceable judgment.
We turn first to consideration of the verdict. There can be no question but that the jury's attempt to apportion the liability of defendants rendered it irregular. Malinauskas v. Public Serv. Interstate Transp. Co., 6 N.J. 269, 274 (1951). The question to be determined is whether the irregularity was such as to vitiate the judgment, and, if so, whether the new trial should be as to all issues or as to damages only.
While the best method of correcting a verdict is to allow the jury to do so before it is discharged, Fuller v. Chamberlain, 52 Mass. (11 Met.) 503 (Sup. Jud. Ct. 1846), a verdict defective in form may be molded by the trial judge to reflect the jury's intention where such intention is clear and manifest. Turon v. J. & L. Construction Co., 8 N.J. 543, 552 (1952). However, defendants contend that the defect inherent in the present verdict was more than one of form.
In Ross v. Pennsylvania R.R., 5 N.J. Misc. 811, 138 A. 383 (Sup. Ct. 1927), on which defendants rely heavily, the jury rendered a verdict against defendant railroad and a verdict in a similar amount against its engineer, in an action under the Death Act arising out of a grade crossing accident. A rule to show cause why the verdict should not be set aside was made absolute, the court holding:
"* * * The wording of the verdict indicates an intention to apportion the damages as between the two defendants, making each one of them liable for the amount specified in its findings, and awarding the plaintiff the sum total of these two amounts. Whether its purpose was other than that expressed by it in the verdict actually rendered cannot be guessed at by the court. In the absence of anything even suggestive of a different purpose on the part of the jury, we must accept its statement as indicating it; namely to apportion the damages between the two joint wrong-doers."
To somewhat the same effect was Rafferty v. Public Serv. Interstate Transp. Co., 13 N.J. Misc. 80, 177 A. 357 (Sup. *239 Ct. 1934), in which a new trial was ordered because the jury had rendered verdicts in different amounts against the defendant bus owner and its driver. Other cases in which juries attempted to apportion damages, or otherwise control the legal effect of the judgment, are: Trovato v. Capozzi, 14 N.J. Misc. 24, 182 A. 269 (Cir. Ct. 1935), affirmed 119 N.J.L. 147 (E. & A. 1937); Robb v. John C. Hickey, Inc., 19 N.J. Misc. 455, 20 A.2d 707 (Cir. Ct. 1941), and Walder v. Manahan, 21 N.J. Misc. 1, 29 A.2d 395 (Cir. Ct. 1942). In Trovato a direction in the verdict that the amount of damages awarded be paid at the rate of $14 per week was held to invalidate the verdict; in Robb the verdict was set aside because the jury had found both plaintiff and defendant guilty of negligence, but by comparing the degree of their negligence, arrived at a verdict of $2,000 for plaintiff. And in Walder the circuit judge set aside a verdict "in favor of the plaintiff and against the defendants in the sum of $20,000, $10,000 against each defendant," under the apparent impression that the only New Jersey case in point was Ross v. Pennsylvania R.R., supra (5 N.J. Misc. 811), which he said should be followed "until the Court of Errors and Appeals rules to the contrary."
Plaintiff urges that the Court of Errors and Appeals had already ruled, and the question sub judice is controlled by Jones v. Pennsylvania R.R., 78 N.J.L. 571 (E. & A. 1910). In that case a verdict was returned against joint tortfeasors in the sum of $3,000 each and judgment was entered for total damages of $6,000. When the verdict was returned, the clerk (who was at that time permitted to receive the verdict) had formally inquired of the jury:
"* * * Gentlemen, hearken to your verdict as the court has ordered it recorded; you find the defendants the Pennsylvania Railroad Company and the Public Service Corporation guilty, and assess the damages of the plaintiff at the sum of $6,000 * * *."
To this the jury all agreed and judgment was entered accordingly. In affirming the judgment the court held:
*240 "It is clear, we think, that the court below properly held that the verdict as thus recorded was the verdict intended to be rendered and actually rendered by the jury. * * * The query that he [the clerk] put and the assent of the jury to it sufficiently showed that their assessment of damages was $6,000 and not $3,000, and warranted the entry of the verdict and judgment accordingly."
Under our present rules inquiry of the jury by the court to ascertain its intention in aid of a proper judgment is permitted  and frequently called for. Turon v. J. & L. Construction Co., supra, 8 N.J., at pp. 551-552 (citing Jones). Generally, the answer of the foreman to such inquiry is to be taken as the answer of the individual members in the absence of objection by an individual juror. Id., at p. 552. Where, in response to such an inquiry, the intention of the jury is made clear, the verdict may be molded in consonance therewith. Id., at pp. 552-553. Cf. Rillo v. Eastern Carrier Corp., 132 N.J.L. 414 (E. & A. 1945).
Here, on the motion to mold the verdict, the trial judge found, and we agree, that the jury's verdict clearly and unmistakenly evidenced its intention to award plaintiff the sum of $17,000 against all three defendants. This was made manifest by the first part of the verdict where the jury found "in favor of the plaintiff, Mrs. Gilday and against the defendant Hauchwit and Officer Carlo and the City of Passaic in the total sum of $17,000 * * *." It was confirmed by the forelady's affirmative answer to the trial judge's inquiry as to whether the sum of $17,000 represented the aggregate amount of the verdict.
The molding of the jury's verdict by the trial judge was in conformity with the majority rule that where the jury has returned a general verdict for the plaintiff against joint tortfeasors but has attempted to apportion the amount thereof among them, the court may correct or amend the verdict by striking out as surplusage that part which attempts to apportion the damages, leaving the verdict to stand as a joint one against all of the defendants properly held liable. Annotation, "Disregard or correction by court of apportionment of *241 verdict among joint tortfeasors," 8 A.L.R.2d 862, 872 (1949); Atherton v. Crandlemire, 140 Me. 28, 33 A.2d 303 (Sup. Jud. Ct. 1943); Klepper v. Seymour House Corp., 246 N.Y. 85, 158 N.E. 29, 62 A.L.R. 955 (Ct. App. 1927); Wands v. City of Schenectady, 171 App. Div. 94, 156 N.Y.S. 860 (App. Div. 1916); Cincinnati Traction Co. v. Cochran, 20 Ohio App. 108, 153 N.E. 116 (Ct. App. 1923); Fitzgerald v. Davis, 237 Ill. App. 488 (App. Ct. 1925); Emblem Oil Co. v. Taylor, 118 Pa. Super. 259, 179 A. 773 (Super. Ct. 1935); Bakken v. Lewis, 223 Minn. 329, 26 N.W.2d 478 (Sup. Ct. 1947); Meridian City Lines v. Baker, 206 Miss. 58, 39 So.2d 541, 8 A.L.R.2d 854 (Sup. Ct. 1949). Contra, Mooney v. McCarthy, 107 Vt. 425, 181 A. 117 (Sup. Ct. 1935); Whitaker v. Tatem, 48 Conn. 520 (Sup. Ct. Err. 1881).
The underlying reason for the majority rule would appear to be that any attempt at apportionment by the jury is a nullity amounting to, at most, a recommendation which the court is free to ignore. Where jury verdicts have been sustained for the gross amount thereof against all defendants, notwithstanding attempts at apportioning damages between them, no distinction appears to have been made between instances where damages were apportioned equally and where they were not. Klepper v. Seymour House Corp., supra (verdict of $37,500, divided $20,000 and $17,500); Currier v. Swan, 63 Me. 323 (Sup. Jud. Ct. 1874) (verdict for $80, allocated $5 against one defendant and $25 each against the remaining three); Bakken v. Lewis, supra (verdict for $30,000, divided $22,500 and $7,500); Morgan v. Gore, 96 Colo. 508, 44 P.2d 918 (Sup. Ct. 1935) (verdict for $2,500 apportioned 75% against one defendant and 25% against the other); Weddle v. Loges, 52 Cal. App.2d 115, 125 P.2d 914 (D. Ct. App. 1942) (verdict for $5,000 divided $4,250 and $750).
Defendants urge that the jury's attempt to allocate the amount of the judgment unequally among them vitiated the verdict in its entirety, citing Ross v. Pennsylvania R.R., supra, 5 N.J. Misc. 811, and Rafferty v. Public Serv. Interstate *242 Transp. Co., supra, 13 N.J. Misc. 80. We find neither Ross nor Rafferty to be apposite. Rafferty involved a suit in which the defendant bus owner could be held only by the application of respondeat superior, thus necessitating a verdict in one amount against both master and servant, and the jury's arbitrary and illegal attempt to apportion the verdict was held to call for a new trial. In Ross there was no finding by the jury as to the total amount of damages it intended to award. In the instant case there was such a finding. We cannot say that the jury, in its attempted allocation of damages, was deliberately disregarding the charge. On the contrary, it had been instructed to "consider the issue of liability of each defendant separately" and could have innocently, though erroneously, assumed this to be an invitation to state, as part of its verdict, to what extent it found that each defendant's fault had contributed to the damages represented by the verdict.
While Hauchwit does not challenge the adequacy of the testimony to support the verdict rendered against him, Carlo and Passaic each urge that their motions for judgment under R.R. 4:51-1, made at the end of plaintiff's case and at the close of the evidence, should have been granted. We need consider only the latter. Guzzi v. Jersey Central Power & Light Co., 20 N.J. Super. 296, 300 (App. Div. 1952), reversed on other grounds 12 N.J. 251 (1953).
On a motion for judgment the trial judge may not weigh the evidence but is required to accept as true all evidence which supports the plaintiff's contention as to liability, and to accord plaintiff the benefit of all legitimate inferences to be drawn therefrom. Visaggi v. Frank's Bar and Grill, Inc., 4 N.J. 93, 98 (1950). Where fair-minded men may honestly differ as to the conclusions to be drawn from the proofs, the question is one for the jury. Kopec v. Kakowski, 34 N.J. 243 (1961).
We are satisfied that the issue of Carlo's negligence was properly submitted to the jury.
The rule is well settled that a municipal employee may be held individually liable in damages for injuries sustained *243 by third parties through his negligent performance of duty. Florio v. Jersey City, 101 N.J.L. 535 (E. & A. 1925) (driver of fire apparatus negligently drove it into plaintiff); Davis v. Hellwig, 21 N.J. 412 (1956) (police officer fired at thief running down narrow street without prior thorough observation for pedestrians). See generally, 37 Am. Jur., Municipal Corporations, § 264, pp. 887-888 (1941); Annotations, 60 A.L.R.2d 873 (1958), 39 A.L.R. 1306 (1925), 18 A.L.R. 197 (1922).
In the instant case Carlo had been detailed by his superiors to direct traffic during the evening rush hour. The intersection to which he was assigned was located in the heart of the business area and involved two of its principal streets. It may be inferred that the ordinary traffic lights were considered to be inadequate during the period mentioned  hence the additional services to be performed by him.
Carlo testified that, in general, his job was to keep traffic moving at all times. At one point, when queried as to his specific function with regard to pedestrians, he testified:
"Q. What was your function with respect to traffic moving when pedestrians were crossing on this particular day? A. I let the cars make a left only when there were no pedestrians crossing.
Q. And is that why you made an observation to the northeast corner and the area near there in the crosswalk before you summoned Mr. Hauchwit to make his left turn? A. Yes.
Q. Is that right? A. That's right.
Q. And had you seen a pedestrian crossing you would have kept Mr. Hauchwit where he was until the pedestrian got across, is that right? A. That's right."
He further testified:
"Q. And again, the purpose of your looking to the area of the northeast corner before summoning Mr. Hauchwit to make his left-hand turn was what? A. To see that there were no pedestrians crossing from that corner."
Having thus assumed to regulate the left-hand movement of vehicles with relation to pedestrian traffic crossing East Main Avenue, Carlo was obliged to exercise reasonable care in the *244 performance thereof. Cf. Gudnestad v. Seaboard Coal Dock Co., 27 N.J. Super. 227, 233 (App. Div. 1953), reversed on other grounds 15 N.J. 210 (1954); Wolcott v. New York & L.B.R.R., 68 N.J.L. 421 (Sup. Ct. 1902).
Carlo says that he looked for pedestrians and, seeing no one on the crosswalk, signalled Hauchwit to proceed. Considering the proofs in the light most favorable to plaintiff, the jury could have determined that she was on the crosswalk at the time and that Carlo either did not look or failed to make an observation which was reasonably adequate.
It is urged that assuming Carlo's negligence, it could not have been a proximate cause of the accident, since Carlo had the right to assume that Hauchwit would yield the right-of-way to pedestrians on the crosswalk, R.S. 39:4-35; N.J.S.A. 39:4-32 and 36, and the latter's failure to do so constituted an intervening cause which broke the chain of causation between Carlo's asserted negligence and the accident. We disagree. If the intervening act is one of the foreseeable risks which makes the actor's conduct negligent, it does not break the chain. Rappaport v. Nichols, 31 N.J. 188, 203 (1959); Menth v. Breeze Corp., 4 N.J. 428, 441-442 (1950); Andreoli v. Natural Gas Co., 57 N.J. Super. 356, 366-367 (App. Div. 1959). Here the danger presented by rush-hour traffic, as aggravated by the left-hand turn movement permitted at the intersection, was the very thing which Carlo had been delegated to guard against. Whether a reasonably prudent person, situated as was Carlo, would have recognized and seen that an unreasonable risk and likelihood of harm or danger to pedestrians would result from his failure to make a reasonable observation for them, Schaublin v. Leber, 50 N.J. Super. 506, 510 (App. Div. 1958), or, more specifically, whether by permitting traffic to turn left without an adequate observation (and while plaintiff was still negotiating the crossing), he brought about a situation which involved an unreasonable risk of harm to her, Restatement, Torts 2d §§ 302-303 (1965), were questions of fact and not of law. Here the jury could have determined that Carlo, as *245 an experienced police officer, should have anticipated that at this busy intersection, at the height of the evening rush hour, a motorist might fail to detect the presence of a pedestrian on a crosswalk in time to stop  especially where, as here, the motorist in question was moving in direct response to the signal of a police officer, R.S. 39:4-80, and in the direction indicated by the latter. See Stafford v. Jones, 292 Mass. 489, 198 N.E. 745 (Sup. Jud. Ct. 1935).
We are satisfied that the evidence was sufficient to sustain a finding by the jury that Carlo was guilty of negligence in the performance of the duty which he had undertaken at the intersection; that the failure of Hauchwit to detect the presence of plaintiff on the crosswalk was a foreseeable risk which did not break the chain of causation, and that, consequently, Carlo's negligence remained a proximate cause of the accident. See Joy v. City of Jamestown, 207 Misc. 873, 141 N.Y.S.2d 325 (Sup. Ct. 1955), affirmed per curiam, 286 App. Div. 991, 144 N.Y.S.2d 742 (App. Div. 1955). Hence his motion to set aside the verdict was properly denied. Kulbacki v. Sobchinsky, 38 N.J. 435, 445 (1962).
We turn, finally, to the question of Passaic's responsibility for the negligence of Carlo. Although in the pretrial order it was charged that Carlo was assigned the duty of directing traffic without previous adequate training and instruction, no proof to that effect was produced at the trial. Thus, Passaic's liability depended upon application of the doctrine of respondeat superior and the jury was charged, in terms of McAndrew v. Mularchuk, supra, 33 N.J. 172, that there could be no verdict against Passaic unless Carlo, its servant, was found to have been guilty of active wrongdoing, as distinguished from mere negligent omission.
Defendants urge that, at most, Carlo's failure was one of omission in that he permitted Hauchwit to make a left-hand turn without ascertaining whether the way was clear. Plaintiff (and defendant Hauchwit), on the other hand, argue that in directing Hauchwit to proceed Carlo was guilty of an *246 affirmative act of negligence for which Passaic should be held.
In Allas v. Rumson, supra, Justice Heher noted:
"* * * There is some confusion in the adjudicated cases as to what constitutes active wrongdoing by a municipality, and the line of demarcation is not always clearly maintained. The difficulty usually lies in the application of the principle to the facts of the particular case. The true distinction seems to be whether the private injury has resulted from a wrongful act or positive misfeasance, as distinguished from mere negligence. A private action must rest upon some positive, affirmative act, `wrongful in itself, and detrimental to the plaintiff.'" (115 N.J.L., at p. 595.)
The confusion referred to continues to the present day. Its resolution here calls for an analysis of the work Carlo was performing at the time of the accident.
While there were two traffic light signals at the intersection, the record is not clear as to whether they were in operation at the time of the accident. Mrs. Gilday testified that they were not and that Carlo was in sole control. Carlo testified that they were and that he was there only to assist in the movement of traffic during the evening rush hour. He was stationed in the middle of the East Main Avenue intersection. At the location in question the former Erie Railroad right of way separated Main Avenue from East Main Avenue. East of Main Avenue the intersecting street was known as Washington Place, whereas west of Main Avenue it was known as Broadway. Traffic on Broadway approaching East Main Avenue was required either to turn left (north) on East Main Avenue or continue straight ahead into Washington Place.
Mrs. Gilday was crossing from the northeast to the northwest corner of East Main Avenue, which would have brought her to the sidewalk which paralleled the former railroad right of way. In describing the happening of the accident she testified that she waited for Carlo's signal; he was facing north (towards her) and waved his arm for her to proceed; when she was about halfway across he turned his back to her, looking *247 to the south. As she was walking across she noticed a line of cars stopped on the cross street. Then:
"I proceeded and when I was about six feet before the other side toward which I was walking, this first car in line came sharply, making a sharp left turn towards me. I quickened my pace to get out of the way of the car.

* * * * * * * *
I quickened my pace to get out of the way of the car but I couldn't. Then he struck me with the left front of his car on my left side."
Hauchwit described Carlo's action in this manner:
"Q. And where was the officer? A. The officer was in the middle of the intersection just directly in front of me.
Q. And how is it that you stopped when you did? What caused you to stop? A. The officer signaled me to stop.
Q. And do you recall how he signaled you? A. If I remember correctly he put his hand up for me to stop.

* * * * * * * *
Q. Now, in what manner did Officer Carlo give you the signal to go? A. He was facing south at the time and he looked over both shoulders and waved me [to pass] behind his back.
Q. And you say he looked over both shoulders? A. Yes, sir.
Q. His right shoulder, that would be in your direction? A. Yes, sir.
Q. And when he looked over his left shoulder what direction would that be in? A. That would be in the direction of the northeast corner.
Q. Would you stand up and show us how he signaled. A. He was facing south and my car would be over here at the time. He looked over his right shoulder, he looked over his left shoulder, then waved me on behind his back in this manner.
Q. Now, what did you do then? A. Well, I proceeded to go. I didn't notice anyone or see anyone crossing, so I proceeded to make my turn."
Carlo himself testified:
"I was facing south on East Main. Mr. Hauchwit was coming down, was coming east on Broadway, got to the tracks and I already had my hand up before he reached the tracks for him to stop, because there were cars coming from Washington Place going west, which I had directed them to keep coming. Then I stopped that traffic, looked over my right shoulder and my left shoulder to see if there were any pedestrians crossing on the crosswalk, which I didn't see. I then directed him to make his left with my hand motion. * * *
Q. And you saw no pedestrians? A. That's correct."
*248 Carlo testified that he would synchronize his directions with the traffic lights and that Hauchwit had signaled for a left turn before receiving the signal to move. Even if the light (for east-west traffic) was green, a left turn there was not permitted unless he directed it. At the time he allowed Hauchwit to start the light was green.
We incline to the view that the negligence of Carlo amounted to no more than an act of omission, i.e., failure to make a reasonable observation for pedestrians on the crosswalk before permitting a left-hand turn across it. In the event that the traffic lights had constituted the sole means of traffic control at the time in question, and the light had turned green while a pedestrian was on the crosswalk, it could hardly be argued that this constituted active wrongdoing for which Passaic would have been liable in damages for the consequent striking of a pedestrian by a motorist who had proceeded in conformity with the light but in disregard of R.S. 39:4-35. Whether Carlo's function at the intersection was as a substitute for the green light or to supplement it, he assumed the duty of preventing the movement of traffic intending to make a left turn until he ascertained that the way was clear. This involved making observations for automobile traffic proceeding in the opposite direction and for pedestrians in the act of crossing. As noted, he testified that he looked and observed no one on the crosswalk. From what occurred immediately thereafter the jury could well have found that his observations, if made, were faulty in the extreme and that he had consequently omitted to exercise reasonable care in controlling the left-hand movement of traffic into East Main Street.
The case here presented is to be distinguished from one in which a traffic officer signals traffic moving on intersecting streets to proceed simultaneously into an intersection, thus precipitating a collision. Likewise distinguishable are cases involving the creation of a dangerous condition on municipal property and omitting to guard against it, Allas v. Rumson, supra; making an excavation in the highway and failure to *249 fence it, Hammond v. County of Monmouth, 117 N.J.L. 11 (Sup. Ct. 1936); tethering a horse in the driveway to an automobile parking lot and leaving the horse unattended, Kelley v. Curtiss, 29 N.J. Super. 291 (App. Div. 1954), reversed on other grounds 16 N.J. 265 (1954); and the use of dangerous instrumentalities without adequate safeguards or instruction, McAndrew v. Mularchuk, supra; Kress v. City of Newark, 8 N.J. 562 (1952). Here Carlo's failure to detect plaintiff's presence on the crosswalk was not an omission to take protective measures to avoid the effect of a municipally created danger  it actually set the stage for the unfortunate occurrence which followed.
The evidence adduced and the legitimate inferences to be drawn therefrom, considered in the light most favorable to plaintiff, failed to afford sufficient basis for a determination that Passaic through its agent, Carlo, had been guilty of active wrongdoing in the performance of its duty at the crossing in question. At the most, Carlo omitted to make a reasonable observation and to hold Hauchwit until he had done so. The issue of Passaic's liability should not have been submitted to the jury but should have been disposed of by the court on the motion for judgment of dismissal. R.R. 4:51-1 and 2.
The judgment of the Law Division is accordingly affirmed as to defendants Hauchwit and Carlo and remanded for a new trial as to defendant Passaic.
GAULKIN, S.J.A.D. (dissenting).
I concur, except as to defendant Carlo. As to him I would reverse.
Even assuming Carlo motioned for plaintiff to cross, I do not think it was his duty to make sure that she had completed the crossing before permitting or ordering Hauchwit to make a left turn. The majority opinion quotes a part of Carlo's cross-examination as establishing that he had assumed that duty. However, it seems to me that when it is read in the context of the remainder of his testimony it does not *250 prove any such assumption. For example, he testified (emphasis mine):
"Q. And in view of the fact that there were lights already there functioning would you tell us what your role was in handling traffic at that intersection? A. Well, a patrolman is there every day from four to six because the traffic is very heavy.
Q. And what do you do then in addition to what the lights do when you're there during that heavy traffic, or what did you do on that day; what was your function, what were you supposed to do? A. Keep the traffic flowing, keep it moving at all times.
Q. And would you regulate particularly when cars would be making left-hand turns going north from Main Avenue and right-hand turns from Washington Street going north? A. Would I regulate?
Q. Yes, You would determine when these cars should proceed? A. Yes.
Q. And would you also determine when pedestrians were to cross? A. No. The pedestrians crossed with the light.
Q. Supposing a pedestrian is crossing with a light, would you permit a car to make a left-hand turn across the crosswalk when the pedestrian was crossing? A. I usually don't do that."
It is admitted that this was a heavily travelled intersection and that the accident happened during the rush hour. East Main Street was a one-way street carrying several lanes of northbound traffic. Broadway (and Washington Place, its extension) carried two-way traffic, east and west, two lanes in each direction. Traffic east from Broadway and west from Washington Place was permitted to turn north on East Main Street. Traffic proceeding north on East Main Street was not permitted to make a left turn into Broadway but was permitted to make a right turn into Washington Place. Because of the traffic pattern, the traffic lights at the intersection faced only east, west and south  they were blank to the north. It is obvious that Carlo, like the lights, was required principally to face south, east and west.
Any policeman at that intersection at that hour was bound to be a very busy person. As Carlo testified, his job was to "keep the traffic flowing, keep it moving at all times." He had to rely, and he had the right to rely in the absence of notice to the contrary, on the ability of motorists and pedestrians *251 to obey the law and take care of themselves. Of course, if he saw a violation of the law, careless, reckless or drunken driving, or a pedestrian apparently unable to take care of himself or in peril, it would be his duty to act, but no such situation existed here. We are not dealing here with a school crossing guard, detailed to watch over children, but with a traffic policeman on ordinary traffic duty. He has only two eyes and can face in only one direction at a time. To hold him responsible for failing to keep an eye on every pedestrian at such a time seems to me to be unreasonable and unrealistic.
Whether the traffic signals were working or not, Carlo's motions to direct traffic were simply to keep traffic flowing, not to license the violation of a pedestrian's right of way on a crosswalk. I do not mean to suggest that a police officer may never be held liable for giving improper directions. For example, I should think a police officer could be held liable if he directed a motorist the wrong way into a one-way street, or to pass on a blind curve, resulting in injury to the motorist or others, but this was not that type of situation. Carlo did not motion Hauchwit to turn at a time when the danger of Hauchwit's striking plaintiff was apparent. On the contrary, it was broad daylight, Hauchwit had ample time and space to see and avoid plaintiff, and she had the right of way on the crosswalk. Carlo did not see her and, under the circumstances, he was not obliged to look for her, even assuming he had motioned her to cross.
In short, it seems to me that the sole proximate culpable cause of the accident was Hauchwit's intervening negligence; that Carlo was plainly not negligent; and, even if he were, his negligence was not a concurring proximate cause. I would therefore reverse as to Carlo and direct the entry of judgment in his favor.