102 N.J. Super. 208 (1968)
245 A.2d 747
HAZEL KENT, ADMINISTRATRIX AD PROSEQUENDUM OF JOHN F. CROSBY, DECEASED, AND GENERAL ADMINISTRATRIX OF THE ESTATE OF JOHN F. CROSBY, DECEASED, PLAINTIFF-APPELLANT,
v.
COUNTY OF HUDSON, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 13, 1968.
Decided July 25, 1968.
*210 Before Judges CONFORD, COLLESTER and LABRECQUE.
Mr. Lewis M. Holland argued the cause for appellant (Messrs. Warren, Chasan, Leyner & Holland, attorneys).
Mr. Daniel F. Gilmore, Assistant County Counsel, argued the cause for respondent (Mr. William F. Kelly, Jr., Hudson County Counsel, attorney).
The opinion of the court was delivered by LABRECQUE, J.A.D.
Plaintiff, as general administratrix of the estate of John F. Crosby, deceased, appeals from a judgment in favor of defendant County of Hudson following a jury verdict of no cause for action.
On March 31, 1964 plaintiff's decedent, John F. Crosby, was severely burned while a pay patient at the Berthold S. Pollak Hospital for Chest Diseases (Pollak Hospital), a facility owned and operated by defendant. He died on April 4, 1964 as the result of his burns. Thereafter plaintiff, as administratrix ad prosequendum and general administratrix, instituted the present suit to recover, respectively, for decedent's wrongful death and for his medical and hospital expenses and the pain and suffering he underwent following *211 the accident. Defendant pleaded governmental immunity and contributory negligence as special defenses.
The testimony as to the occurrences leading up to decedent's death may be summarized as follows. On November 25, 1963 decedent, then 65 and suffering from diabetes, arthritis and a chronic brain syndrome, was transferred from a nursing home to the geriatrics section of the Pollak Hospital for treatment and care. He was described as "incapable of taking care of his physical functions," was "dizzy at times" and "always falling." On several occasions while at home he had burned himself or the furniture through the use of cigarettes.
Upon his transfer to Pollak Hospital decedent's children told the nurse in charge and the attendants that decedent "had previous trouble with cigarettes due to senility" and asked them "to control his cigarettes and stay with him while he smoked." Cigarettes (not matches) intended for decedent's use, were entrusted to the floor nurse for safekeeping.
Although it does not appear that decedent's smoking habits were interfered with during the period immediately following his admission, it was not long before cigarettes were taken away from him by those in charge and he was allowed to have one only when accompanied by an attendant. The cigarettes for his use (entrusted to the nurses by his children) were kept locked in a medicine closet to which only the head nurse and one other nurse had access.
Towards the end of December 1963 three of decedent's fingers were burned when a book of matches allegedly flared up while he was handling it. Thereafter a notation was entered on the "Doctor's Order Sheet" which read "Not [to] let him have cigarettes." The order was initialed by Mrs. Looby, the head nurse. Decedent's daughter testified that on her weekly visits she had regularly noticed holes burned in decedent's robe and pajamas. However, this was not observed by the head nurse.
A nurse's aide (one step above an orderly) testified that at about 11 A.M. on March 31, 1964, upon hearing screams *212 emanating from the 11th floor solarium in the geriatrics section, he rushed in and found decedent tied in a reclining chair by a leather belt and on fire. The fire was not extinguished until decedent had sustained extensive second-degree burns. He was subsequently transferred to the Jersey City Medical Center where he died.
Although there were 46 to 47 patients on the 11th floor, the only personnel on duty there at the time of the incident were the nurse's aide, a nurse and a porter. The person who had moved decedent from his bed to the solarium and had then strapped him into the chair was not identified. However, Mrs. Looby, who was in general charge of the floor, testified that she had observed decedent seated in the chair in the solarium at about 10 A.M. He was then unattended and was restrained with a drawsheet, not straps. She testified that this was done because "Mr. Crosby was starting to wander * * * because every chance he got he went downstairs or the elevator." The only other people in the room were approximately ten patients (presumably also diabetic geriatrics). She further testified that prior to the accident she had been allowing decedent to have cigarettes, but only when an attendant would procure one from her (or the staff nurse) and then "Give it to Mr. Crosby and light it and stay with him while he smoked." She confirmed the incident in December 1963 when decedent sustained burns to his fingers when a book of matches flared up in his hand, but could not state whether an attendant was with him at the time this happened. There was no report of this incident in the hospital records.
Miss Vera, the staff nurse who was in charge in the absence of the head nurse, testified that she had been working on another part of the floor when the accident occurred and did not know who had moved decedent into the solarium and strapped him in the chair. When she administered medication to him early in the morning in his room she found him to be confused. She left him there with a Mrs. Santos, an attendant.
*213 Both nurses testified that the cigarettes (and matches) were kept in a locked cabinet (in which the medicines were also kept) to which only they had access. The inference from their testimony was that neither had given a cigarette to defendant that morning, prior to the accident. Neither Mrs. Santos nor the porter who was on duty were called as witnesses.
There was no direct testimony as to just what happened at the time of the accident. The hospital's "progress record" of the patient contains a recital that he was "burned while smoking in bed." It is clear from the other proofs that the italicized words should have read "in a chair." Plaintiff testified that she received a telephone call from Dr. Boylan, the attending physician at the hospital, who said, "I am calling to tell you that your father Mr. Crosby has met with an accident. He was smoking and caught fire and had been burning for quite a while until someone could get to him and he is severely burned * * *." Dr. Boylan testified that he didn't think he did any more than tell plaintiff that her father had been burned in an accident at the hospital. A portion of the patient's "progress record" which bore his signature recited that:
"The [patient] found on solarium engulfed in flames. Attendant immediately wrapped [patient] in blankets and smothered the flames. Then other employees used a Soda and Acid fire extinguisher to douse the blankets and patient who was then returned to bed. Nurse removed remaining charred clothing and cleansed the body with plain water.
There are extensive second degree burns of the head, neck, shoulders, face, arms, chest, back, and trunk onto both thighs. The [patient] is conscious and at present not in shock. Dr. Timmes notified for [consultation]. [Patient] to be transferred to 15th surgical floor for further treatment."
The "incident report," which was signed by Dr. Boylan, referred to the nurses' report which recited that:
"While giving pre-lunch Insulin, on the West Side of the 11th floor and upon returning to the treatment room to rinse syringes, I smelled smoke and hurried to investigate the source. When I *214 got to the East side corridor I saw smoke and the floor was all wet. In the solarium the patient, Mr. John Crosby was on the floor along side of a smoldering chair. The porter, Mr. D. Hoffman had by this time smoldered the fire on the patient with sheets. The porter hastily ran and got the fire extinguisher and applied it to the sheets and chair.
Then we picked up the patient and placed him in a chair and put him to bed. I then immediately returned to the phone and called front desk to report the fire. I called physician for emergency help then returned to the patient's room and removed burned clothing and applied blankets (as external heat).
Dr. Boylan responded rapidly as well as surgical resident and then emergency treatment was started. M. Vera. R.N."
The trial judge dismissed the count seeking recovery under the Death Act, N.J.S. 2A:31-1 et seq., for failure to prove damages. He denied plaintiff's motion to strike and withdraw from the jury's consideration the defense of contributory negligence. The case was then submitted to the jury under a charge which required it to factually determine whether decedent's injury had resulted from defendant's active wrongdoing in the performance of its duty of caring for decedent and whether he was guilty of contributory negligence, and hence barred from recovery. The jury rendered a verdict of no cause for action and a subsequent motion for judgment for plaintiff n.o.v or for a new trial was denied by the trial judge. The present appeal challenges only the judgment against the general administratrix based upon the jury's verdict.
Disposition of the matter before us calls for resolution of two issues: (1) was it proper to submit to the jury as a matter of defense the issue of decedent's asserted contributory negligence, and (2) was the jury properly charged as to what constituted active wrongdoing which would justify a recovery against the defendant.

I
In general, the question of the existence vel non of contributory negligence is one for determination by the jury *215 rather than the court. Battaglia v. Norton, 16 N.J. 171, 179 (1954). The test is whether different minds could reasonably come to different conclusions as to the facts, or may reasonably disagree as to the inferences derivable therefrom. Shutka v. Pennsylvania R.R. Co., 74 N.J. Super. 381, 389 (App. Div. 1962), certification denied 38 N.J. 183 (1962). In the absence of disputed facts, or disputed inferences to be drawn from the undisputed facts, it becomes the duty of the court "to declare the judgment which the law imposes" and there is no warrant for submission of the issue to the jury. Kaufman v. Pennsylvania Railroad Co., 2 N.J. 318, 324 (1949). We are satisfied and hold that in the posture of the evidence here presented it was error to do so.
We are not here concerned with whether the known or observed acts of decedent were negligent ones. As noted, supra, the record is devoid of any testimony upon which an inference could be based that decedent voluntarily did anything which contributed in any way to the accident. The burden of adducing such testimony was upon defendant. In the absence of such proof and in view of his physical and mental state, a genuine issue as to his negligence was not presented. Further, any asserted act of negligence on his part could not be held to be a contributing proximate cause of his death since he had placed himself in the custody and care of defendant for the very purpose of protecting himself against its effects.
From the record of his admission it is clear that when defendant accepted decedent as a pay patient it was aware of the fact that he was suffering from, among other things, diabetes as well as a chronic brain syndrome. At the time of the accident its representatives knew (or should have known) that he was incapable of taking care of his physical functions, was dizzy at times, had a tendency to fall, had spells of confusion and had previously burned himself while smoking. Dr. Boylan, who was the director of geriatrics and in charge of the case, testified that some of the symptoms of a chronic brain syndrome were uncoordination and, at times, *216 disorientation as to time or place or people. Mrs. Looby, the head nurse, testified that she understood it to mean that decedent's "senses were dull and at times he would be very confused." The record leaves no doubt as to the existence of such confusion on decedent's part. While there were intermittent references to it in the early nurses' notes admitted in evidence, his condition in that regard became sharply aggravated during the two weeks prior to the accident. The nurses' notes, for that period, insofar as referable to his confusion, read as follows:
March 17 (morning)  "Very confused. tried to get on elevator to go Hoboken. * * * Watch carefully." (afternoon) "Very confused. * * * Keeping close watch on [patient]."
March 18  "Confused."
March 19  "[Patient] wandered off by himself. [Apprehended] on 1st fl. * * *."
March 21  "[Out of bed] in chair [with] restrain. * * * Keeping close to watch [patient] carefully * * * very confused."
March 22  "[Out of bed] in chair [with] restrain. Confused. Observed all time."
March 23  "Confused."
March 24  "Very confused."
March 25  (morning) "[Out of bed] in chair [with] restrain. Very confused. Observed all A.M. carefully." (afternoon) "Remains confused. Observed."
March 26  "Confused [at] times."
March [27]  "[Out of bed] in chair [with] restrain. [Patient] very confused. Observed all time."
March 28  (morning) "Confused." (afternoon) "Remains very confused."
March 29  "Remains confused."
March 30  "Remains very confused."
The accident occurred on the following day.
There was no substantial contradiction of the foregoing. Most of the notations referred to were in the handwriting of one or the other of the nurses who testified for defendant. We are satisfied that on the foregoing facts submission of the issue of decedent's contributory negligence to the jury was but an invitation to surmise, conjecture and speculation. 65A C.J.S. Negligence § 253, pp. 830-832 (1966).
*217 We are likewise satisfied that, assuming the proofs supported the conclusion that some action on decedent's part had played a part in bringing the fire about, it would not have precluded a recovery for his injuries. There is no proof that decedent was forbidden the use of the solarium and it can hardly be claimed that he tied himself in the chair. The only other act which could have contributed to his injury would have been his smoking or attempting to do so. Defendant's duty was based upon its contractual obligation to care for one who was no longer able to care for himself. The risk posed by his smoking was reasonably foreseeable as far back as the time of his admission. One of the purposes of his admission had been avoidance of that very risk. The duty of guarding against it was recognized and assumed by defendant and, in consequence, an order was given not to allow him cigarettes. Later, Mrs. Looby, as head nurse, made it a rule that decedent was not to be permitted cigarettes unless from an attendant who would light the cigarettes and remain with him while he was smoking. The duty owing to decedent under the circumstances exceeded that of the public at large and precluded a finding that smoking on the part of the decedent absolved defendant from the effects of negligence (in the sense of active wrongdoing) in the performance of its duty of protecting him against the effects of such action on his part.[1] An institution whose employees negligently omit to put up the sideboards on the bed of an elderly or ill patient should not, in logic, escape liability because the patient did the very thing which the act omitted by its employees was designed to prevent.
Since we are without knowledge as to whether the jury's verdict was based upon the absence of defendant's negligence or a finding of decedent's contributory negligence, there must be a reversal.

*218 II
On the issue of active wrongdoing the trial judge charged, in pertinent part, as follows:
"The operation of the Pollak Hospital by the County of Hudson is a governmental function. It is the law that the County in the performance of the governmental function, is carrying out a public duty and it is not liable for negligence in the performance of that duty, except upon proof of what is called active wrongdoing, chargeable to the County. * * * Someplace in the sequence of events that happened here, you must find, in order to hold the County liable, some act, that is, the kind of negligence that I described before as being an act of commission as distinguished from merely an action of omission. * * * It is the law of this State that a County such as the County of Hudson in the performance of a governmental function is not liable for negligence in the performing of such a duty except on proof of active wrongdoing, that is, that kind of negligence which I am defining as an act of commission which is wrongful. * * * Now, it is not necessary that this negligent act of commission be the most proximate or the nearest in time, in a sequence of causes, to the injury sustained. It is sufficient if, in the sequence of causes there is such an affirmative wrongful act, somewhere in the sequence of causes, even though the cause nearest in the succession of events may be a mere omission to act."
When a juror sought further clarification by inquiring, "[I]s it true that your Honor has directed the jury not to consider the question of negligence by omission?" the trial judge responded:
"Well, all I can say in further explanation beyond what I said in my main charge is that the defendant, County, cannot be held liable unless you are satisfied that it is guilty of a negligent act of commission, at least somewhere in the sequence of events that happened. Now, if you find that somewhere in the sequence of events there was such an act of negligent commission, then you may further consider whether there was a negligent act of omission. In other words, if you first find an act of negligent commission on the part of the County, its agent or servant, you may then consider whether the defendant, County then failed or omitted to do what a reasonable person would do under similar circumstances." (Emphasis added)
Plaintiff's challenge to the charge on the issue of active wrongdoing is premised upon that portion thereof which *219 precluded a verdict in favor of plaintiff in the absence of proof of "an affirmative wrongful act" on the part of defendant's agents.
We are in accord with that portion of the charge which holds that in the operation of the Pollak Hospital, the county was engaged in the performance of a governmental function. See Allas v. Borough of Rumson, 115 N.J.L. 593, 594 (E. & A. 1935); Kress v. City of Newark, 8 N.J. 562, 572-73 (1952); 18 McQuillan, Municipal Corporations § 53.86, pp. 359-61 (1963); 26 Am. Jur., Hospitals and Asylums, § 13, p. 594 (1940); 41 C.J.S. Hospitals § 8, p. 341 (1944).
Before proceeding to discussion of plaintiff's main argument on this point, we consider her contention that the rule extending immunity to municipalities in the exercise of governmental functions in the absence of active wrongdoing should be abrogated. We are mindful that the rule has been the subject of criticism for a variety of reasons. See Prosser, Torts (3d ed. 1964) § 125, p. 1004; 2 Harper and James, Torts § 29.6 (1956). See also Cloyes v. Delaware Tp., 23 N.J. 324 (1957); Weeks v. City of Newark, 62 N.J. Super. 166 (App. Div. 1960), affirmed per curiam o.b. 34 N.J. 250 (1961). It becomes increasingly difficult to reconcile a rule which holds a municipality liable for injuries flowing from its failure to repair a traffic light which had broken loose and was facing in the wrong direction, Bergen v. Koppenal, 97 N.J. Super. 265 (App. Div. 1967), certification granted 51 N.J. 183 (1968), with one which would preclude liability for injuries resulting from its failure to properly repair a washout at the same intersection caused by a storm, Buckalew v. Board of Chosen Freeholders of Middlesex, 91 N.J.L. 517 (E. & A. 1918). However, we incline to the view that as to the liability of defendant county here, until a different rule is promulgated by our highest court, we, as an intermediate appellate court, are bound to follow the law as laid down in Kress v. City of Newark, supra, 8 N.J., at pp. 573-574. This is especially *220 so in the light of the policy exemplified by the modified form of immunity from liability which continues to be enjoyed by charity hospitals under N.J.S. 2A:53A-7, 8.
The expression "active wrongdoing" appears to have been first used in Hart v. Board of Chosen Freeholders of Union County, 57 N.J.L. 90 (Sup. Ct. 1894), where the county was held liable for injuries resulting from its affirmative creation of an unguarded excavation in a public highway. The rule there laid down has been followed in a number of cases involving injuries resulting from municipally created public nuisances, usually obstructions in a public way entailing unreasonable risk of injury to those travelling thereon. See Milstrey v. City of Hackensack, 6 N.J. 400 (1951); Taverna v. City of Hoboken, 43 N.J. Super. 160 (App. Div. 1956), certification denied 23 N.J. 474 (1957); Hammond v. Monmouth County, 117 N.J.L. 11 (Sup. Ct. 1936); Fredericks v. Town of Dover, 125 N.J.L. 288 (E. & A. 1940); Newman v. Ocean Township, 127 N.J.L. 287 (E. & A. 1941).
In Allas v. Borough of Rumson, supra, the court extended the doctrine to defective construction on municipal property, i.e., a ramp constructed adjacent to the borough hall without a guardrail. Such construction, it found, constituted the wrongful act or positive misfeasance required for a showing of active wrongdoing on the part of the municipality. In Newman, liability was predicated upon a curb which had become broken and was alleged to have been improperly constructed many years before. Generally, if the original affirmative act of the municipality did not create the nuisance in the first place (as in Allas) it was followed by an act of omission (usually failure to inspect or repair) which was held to transmute the original condition into a nuisance (as in Milstrey and Newman). In Hartman v. City of Brigantine, 42 N.J. Super. 247, 259 (App. Div. 1956), affirmed 23 N.J. 530 (1957), we held that it was not required that all of the causative links in the chain of relationship between the municipality and the accident be comprised of affirmative *221 acts in order for the result to be classifiable as affirmative wrongdoing, so long as there was one affirmative act in the sequence.
In Kress v. City of Newark, supra, the city was held liable to an employee of the Newark City Hospital whose injury had resulted, not from a single "wrongful act," but from failure to instruct her in the performance of her duties. Although liability was premised upon the defendant's affirmative act of putting the plaintiff to work before she had been adequately trained and instructed, it could as well have been put in terms of the omission to instruct her before she was put to work. In McAndrew v. Mularchuk, 33 N.J. 172 (1960), the municipality's liability for the shooting of plaintiff by a police officer was predicated upon its omission to afford proper training to the latter, but in terms of having assigned him to police duty without proper training. The same result followed in Peer v. City of Newark, 71 N.J. Super. 12 (App. Div. 1961), certification denied 36 N.J. 300 (1962), where, in a suit to recover for the accidental shooting of plaintiff by an off-duty police officer, the only wrongdoing chargeable to the municipality was its omission properly to instruct the officer in the handling of firearms (he was required to carry his service revolver during off-duty hours). Again the omission was construed as active wrongdoing on the theory that the officer was assigned to duty without proper instructions.
In the earlier case of Cochran v. Public Service Electric Co., 97 N.J.L. 480 (E. & A. 1922), plaintiff was injured through a collision with a safety isle. It could not be said that the erection of the structure was a wrongful act since it was erected under proper authority. The court there held that the omission to keep it lighted together with the fact that it constituted an obstruction to travel, was sufficient to constitute positive misfeasance on the part of the City of Newark.
In the more recent case of Hayden v. Curley, 34 N.J. 420 (1961), the city had created another obstruction by planting a tree at a point adjacent to the public sidewalk. As *222 the tree grew so also did its roots, with the result that the sidewalk was broken and raised, causing plaintiff to trip and sustain the injury for which she sued. While the court, in reversing the judgment of dismissal in favor of the city, found that by plainting the tree the city had affirmatively created an obstruction in the public way, it held:
"The jury could find it was reasonable [sic] foreseeable at the time of the planting that the tree in the course of its natural growth, which includes the growth and spreading of its roots, would probably disrupt the alignment of the sidewalk. Put another way, a jury could find it was reasonably foreseeable that the tree, if not properly inspected and maintained, would so affect the surrounding sidewalk as to develop from a potential to an actual public nuisance. By assuming sole responsibility for the maintenance of the tree, the city also assumed the duty of avoiding dangerous conditions attributable to its growth. There was evidence that the city failed to fulfill that duty. Under these circumstances, the jury could have reasonably found that the planting of the tree without subsequent adequate inspection or maintenance constituted active wrongdoing." (at pp. 427-428; emphasis added)
It is difficult to conceive of the planting of a shade tree along the public street by a municipal government or a shade tree commission as a wrongful act.
In Zanca v. Conti, 73 N.J. Super. 23 (App. Div. 1962), certification denied Zanca v. Village of Ridgewood, 37 N.J. 522 (1962), we reversed a summary judgment in favor of the Village of Ridgewood on the ground that the facts there alleged afforded a basis for Ridgewood's liability to plaintiffs on the basis of its active wrongdoing. Plaintiffs' decedents in that case were employees of a contractor engaged by the village to lay a sewer line. During the course of the work the joints of a nearby water main belonging to the village were observed to be leaking. Notwithstanding protests by the contractor that the leaking joints created an extrahazardous condition, and a demand for their correction, the situation was not remedied and the water main broke, causing collapse of the excavation in which decedents were working and resulting in their death. We found it unnecessary to determine *223 whether the city's operation of the water system, of which the water main was a part, was proprietary or governmental since:
"[I]f governmental, it is clear that there is ample proof that it installed the water main and permitted it to deteriorate to such a dangerous state as to justify an inference that such neglect amounted to active wrongdoing." (73 N.J. Super., at p. 36; emphasis added)
In Hoy v. Capelli, 48 N.J. 81 (1966), the court, in discussing an oft-quoted opinion of the old Court of Errors and Appeals in Vickers v. City of Camden, 122 N.J.L. 14 (1939), stated:
"There four traffic lights, one at each corner of the intersection, all went out of order, showing green for both highways at the same time. Both drivers involved relied on the light seemingly in his favor and a collision in the intersection resulted. The court broadly held that the failure to repair properly constructed lights which simply became out of order did not amount to active wrongdoing and so immunity barred the suit. (The opinion gives no indication whether the city knew of the malfunction or whether it had existed long enough to impose knowledge on it.) While we do not have to decide the question, it seems almost certain that the case would not be decided the same way today in view of the expanded concept of active wrongdoing previously outlined, assuming, of course, that a municipality had notice of the malfunction or a sufficient time had elapsed so that it could be chargeable therewith and that the resulting situation was a realistically causative factor in the occurrence giving rise to the asserted cause of action." (48 N.J., at pp. 85-86 emphasis added)
In Bergen v. Koppenal, supra, the facts closely resembled those in Vickers. At a highway intersection one of the controlling traffic lights had broken loose and was facing in a different direction. There was proof that a township police officer had noticed the condition and reported it to police headquarters, but no effort was made to warn highway users of the damaged light or otherwise render it inoperative. A motorist coming upon the intersection and observing the green indication displayed by the loosened light proceeded to cross and was struck by a car proceeding on the highway, *224 which actually had the green light. In reversing the involuntary dismissal of the motorist's action as against the municipality we held:
"In this era of expanding municipal tort liability the traditional proprietary-governmental test has fallen into disrepute. B.W. King, Inc. v. Town of West New York, 49 N.J. 318 (1967). Instead, the relevant inquiry is whether or not the municipality is under a duty to act, as distinguished from a situation where the taking of any action is discretionary, or the matter involves the making of a basic governmental policy decision. Hoy v. Capelli, supra; Visidor Corp. v. Borough of Cliffside Park, 48 N.J. 214 (1966); Amelchenko v. Borough of Freehold, 42 N.J. 541 (1964). Once such duty is found to exist, the municipality is held to the standard of reasonable action under the circumstances." (97 N.J. Super., at p. 268).
In Jackson v. Hankinson and Bd. of Ed. of New Shrewsbury, 94 N.J. Super. 505 (App. Div. 1967), affirmed 51 N.J. 230 (1968), suit was brought on behalf of an infant pupil for loss of eyesight caused by a pellet propelled at him by a fellow student while on a school bus. We there held that the requisites of active wrongdoing were satisfied by the affirmative action of the board of education in placing the group of children in a moving bus "under circumstances where concomitantly operative omissions by the board could produce a substantial risk of serious injury to any of the children." In affirming our reversal of the order of the trial judge dismissing the action as against the board of education, the Supreme Court held that plaintiffs were under no obligation to establish active wrongdoing on the part of the board or its agents, but could recover upon a showing that the board had negligently failed to exercise "reasonable supervisory care" for the safety of students while being transported in the bus. See also Titus v. Lindberg, 49 N.J. 66, 78 (1967).
We find the correct rule developed by our cases to be that where a municipality embarks upon a course of conduct which creates a condition which reasonably requires specific precautions in order to avoid an unreasonable risk of harm to *225 those affected thereby, the municipality may be held liable for its omission to take such precautions notwithstanding that such course of conduct is not itself a wrongful act or act of positive misfeasance on the part of the municipality or its agents. Gilday v. Hauchwit, 91 N.J. Super. 233, 249 (App. Div. 1966), reversed in part on other grounds 48 N.J. 557 (1967), cited by defendant, does not hold to the contrary. There the protective measures allegedly omitted by the policeman were not such as were made necessary by any condition brought about by his municipal employer, and plaintiff relied upon the policeman's signal to proceed as a "wrongful act" which justified a finding of active wrongdoing.
It follows that it was error to charge the jury that plaintiff was required to establish "an affirmative wrongful act" on defendant's part as a prerequisite to recovery. That the challenged portion of the charge was prejudicial we have little doubt. The request for further clarification by one of the jurors confirms our conclusion.
The prejudicial effect of the challenged portion of the charge was in no wise eliminated by the fact that, at another point in the charge, the court instructed the jury that if it found that defendant's employees were guilty of negligence in leaving decedent in the solarium without an attendant, that would constitute active wrongdoing. The conduct to be appraised by the jury was not confined to leaving the patient alone in the solarium  it involved leaving him tied in a chair and subject to the dangers posed by cigarettes and/or matches, all while unattended. Further, even had this portion of the charge been adequate, there was no withdrawal of the incorrect portion so that the jury would have been left to choose between the two. Cf. Ellis v. Caprice, 96 N.J. Super. 539, 549 (App. Div. 1967), certification denied 50 N.J. 409 (1967).
In the present case the hospital, with full knowledge of decedent's condition ond of the danger posed by his smoking, adopted a policy which permitted him to do so upon the taking *226 of certain precautions by its employees. Under the facts adduced, the jury could have found that the omission of its employees to carry out these precautions was the proximate cause of the accident. In so deciding, we rely in part on the jury's right to disbelieve certain portions of the testimony adduced by defendant, in the light of all the attendant circumstances developed by the proofs as a whole.
By reason of the foregoing we find it unnecessary to pass upon any additional contentions made by plaintiff, particularly her submission that the recent decision of B.W. King, Inc. v. West New York, 49 N.J. 318 (1967), is a signal of encouragement to disregard the whole active wrongdoing-governmental function ratio decidendi. See Jackson v. Hankinson and Bd. of Ed. of New Shrewsbury, supra, 51 N.J., at p. 235.
Reversed and remanded for a new trial as to plaintiff Hazel Kent as general administratrix of the estate of John F. Crosby, deceased.
NOTES
[1] Viewed in another way, there was no proximate relation between any possible negligence on decedent's part and his injury. Cf. Pangborn v. Central Railroad Co. of N.J., 18 N.J. 84, 100-02 (1955); Jurman v. Samuel Braen, Inc., 47 N.J. 586, 593 (1966).