BOROUGH OF BELMAR POLICEMEN'S BENEVOLENT ASSOCIA-TION OF LOCAL # 50 ET AL., PLAINTIFFS, v. BOROUGH OF BELMAR AND LAWRENCE A. VOLA, CHIEF OF POLICE, DEFENDANTS.

Superior Court of New Jersey
Law Division Monmouth County

Decided May 2, 1980.

---

4In evaluating the considerations raised by the within motions, one may legitimately question the potential constitutional issues raised by a result which would deprive a class of claimants from benefits when their injuries necessarily involved a gap in treatment of more than two years. Would such a result, for example, be reasonably related to any legitimate legislative goal? Having concluded that this statute should not be so read, however, these issues need not be dealt with further.

*Laurence M. McHeffey* for plaintiffs (*Hanlon, Dempsey & McHeffey,* attorneys).

*David A. Wallace* for defendants (*Gerald L. Dorf,* attorney; *Joseph Hillman, Jr.,* co-counsel and on the brief).

*Larry R. Etzweiler,* Deputy Attorney General, for *amicus curiae John J. Degnan,* Attorney General, *John DeCicco,* Assistant Attorney General, on the brief).

*James R. Zazzali* for *amicus curiae* New Jersey State Policemen's Benevolent Association (*Zazzali, Zazzali & Whipple,* attorneys; *Francis J. Vernoia* on the brief).

McGANN, J. S. C.

The essential relief sought in this action in lieu of prerogative writs is a declaration that the Borough of Belmar, through its police chief, does not have the power to hire and assign "special" police officers to the usual duties of "regular" police officers. A resolution of that issue involves an understanding of what those terms mean and an interpretation of applicable statutes. The Attorney General and State P.B.A. have been admitted as *amici curiae.*

Belmar is a small community bordering on the Atlantic Ocean. Its year-round population is 5,782 (1970 census). The estimated 1978 population is 6,300. The borough has a police force of 21 members, comprised of a chief, three captains, four sergeants and 13 patrolmen. The terms and conditions of their employment are fixed by a collective bargaining agreement dated February 14, 1978 and currently in effect.

Outside of the summer months the size of the department is quite adequate to meet the need for a police function. A typical workday schedule for the 21 member department is as follows:

A) Four duty posts.

1) The Desk (headquarters) manned by a Sergeant.

2) A patrol car—for general patrolling throughout the Borough.

3) A patrol car—for general patrolling throughout the Borough.

4) Motorized Scooter—for patrolling of the main business district of the Borough—"F" Street.

These four posts manned for three shifts would occupy 12 men. Four men would be on their day off. (A five-day work week has been negotiated under the collective bargaining agreement.)

B) In addition, two men are assigned for the day to the detective division (essentially a two-shift post).

C) Two men would be on their annual vacation.

D) The Chief has no specifically designated duty post.

Men not scheduled for duty that day (either because it was one of their days off or because they were on annual vacation leave) could be pressed into service when needed and would then be paid overtime under the contract.

The summer season, with its very substantial influx of summer residents and visitors, gives rise to many problems requiring much more police activity than in the winter. Crowd control, particularly in the boardwalk area; concentration of people in local taverns; the increase in noise complaints stemming in part from group summer rentals, and an appreciable rise in disorderly persons and municipal ordinance violations, all point to the need for an increased police presence. Sensitive to that need but sorely constricted by fiscal ability and CAP law limitations, the response of the governing body in consultation with the chief was two-pronged. During the summers of 1977 and 1978 a "summer task force" was created. It consisted of four men and two police cars. Its purpose was to have a ready contingent of trained policemen to respond quickly to any emergent situation which might arise, such as a barroom brawl, a large and uncontrolled private party or a violent domestic quarrel. This task force was worked on a voluntary basis by the regular policemen. It existed on Friday, Saturday and holiday nights. Men who worked that detail were paid overtime under the collective bargaining agreement.

In addition to the "summer task force," and again in response to citizens' complaints, there was created, for the 1979 summer season, an "anti-noise detail." This consists of a police car with two men covering two shifts (2 p. m. to 10 p. m. and 10 p. m. to 6 a. m.), seven days a week, to patrol the borough and spot and respond to incipient trouble. The trouble spots center about parties conducted by group rentals and summer tenants, as well as premises licensed to dispense alcoholic beverages. The "anti-noise detail" was intended to be a permanent organizational change for the summer months, whereas the "summer task force" was a voluntary (though compensated) effort mounted on Friday, Saturday, and holiday nights only.

The police chief, quite properly, deems it necessary to have experienced "regular" officers handle this detail. The judgment to place experienced officers in that car cannot be faulted. Those men, above all, could be expected to regularly confront volatile, violent and ugly situations requiring skilled, well-trained officers with level heads. Each man assigned had to be familiar with local ordinances as well as state statutes, accustomed to making arrests and handling people, and trained in the use of a Decibel meter-since keeping the noise level down at night was one of the principal functions of the patrol.

To make up the "anti-noise" patrol the three regular officers usually assigned to the motorized scooter post on "F" Street and the business district were utilized. The patrol car would operate from 2:00 p. m. to 10:00 p. m. with one of these regulars in it, and from 10:00 p. m. to 6:00 a. m. with the other two. The three shift vacancies on the "F" Street post had to be filled that the. The method used was to hire "special" officers. Plaintiffs argue that the borough may not legally hire "specials" for that purpose.

The "F" Street, business district post, is a most important one. The concentration of retail stores in the borough is there. A bank is located in that area as well as a motel and all-night diner. During the day shoppers crowd the area. At night, restaurants attract other people. The police are responsible for store security after closing. Statistics show that more major

crime is committed within the bounds of this post than in any other part of the borough. In the off-season months the post is covered by motorized scooter. In the summer it becomes a walking post.

To assist in controlling crowds along the beachfront area, the borough hires a number of other "special" officers. Some are posted at regular intervals along Ocean Avenue to cross pedestrians from the beach to the westerly side of Ocean Avenue where there is a large concentration of eating establishments, places of amusement and bars featuring music appealing to young adults. "Specials" are also used for walking patrols along the boardwalk and beach. They are there to maintain a police presence, keep the peace and enforce local ordinances and the disorderly persons laws. Should the situation arise, they are expected to make arrests.

From time to time during the summer a "special" may be assigned to ride with a "regular" in a patrol car to give the added strength of a two-man team. Whenever he does so a "special" is expected to perform exactly as a "regular" would.

The borough provides each "special" with a uniform, a 38-cal. Colt Special, handcuffs, six rounds of ammunition, a nightstick and a slapjack. The borough is aware of its potential civil liability under principles expressed in *McAndrew v. Mularchuk*, 33 *N.J.* 172 (1960). To that end all "specials" must complete a departmental 30-hour training course before being eligible for employment. The course consists of 26 hours of classroom instruction and four hours of firing instruction on the pistol range. No pay is given for the training time. By comparison, "regular" members of the department undergo a 14-week training at the Police Academy and qualify in weapons other than the pistol. When on duty, "specials" are subject to the same rules and regulations as are "regulars."

One last fact is worthy of note, although it is not relevant to the within decision. The borough is operating currently within very tight fiscal constraints. The proofs demonstrated that the 1979 budget was within 88¢ of permitting spending limits under

the so called "Cap Law," *N.J.S.A.* 40A:4–45.1 *et seq.* The police protection furnished by using "specials" is much less expensive than if it were provided by "regulars" paid in accordance with the collective bargaining agreement. To the extent that the use of "specials" is curtailed, police protection will be diminished because the borough may not increase expenditures.

The Legislature has enacted laws governing police departments and the appointment of regular and special police officers. The first comprehensive enactment of this sort was contained in *L.*1917, *c.* 152, broad legislation conferring and revising powers of municipalities. Therein (Art. XVI, § 1) the Legislature empowered each municipality to establish a police department and to employ "officers and men" therein (§ 3) who would, in general, be removable only for good cause. Each municipality was also empowered in the same section as follows:

. . . and provided, further, that it shall be lawful for the board, body or person in the respective municipalities of this State having authority to employ members of the police department therein, to employ officers or men temporarily in case of emergency or for parts of years, in cases where their services are not needed throughout the entire year, and discharge them at the expiration of such temporary employment.

Section 7 of the same legislation provided for special policemen as follows:

The governing body of every municipality shall have power to appoint special policemen for a term not exceeding one year; such special policemen shall not be members of the police force and their powers, rights and duties shall immediately cease and determine at the expiration of the term for which they were appointed. Any such appointment may be revoked at any time without cause and without hearing. Such officers may be furnished with a badge upon the deposit of a sum to be fixed by the governing body, which may be refunded on the return of the badge. A fee may be charged for issuing to any such officer a certificate of appointment.

The legislative scheme, therefore, contemplated three classifications of policemen, to wit:

1. Permanent members of the police department,
2. Temporary members of the police department for emergency or seasonal work,
3. Special policemen who would not be members of the police department to serve at the pleasure of the governing body.

This three-fold classification has been continued to the present. *N.J.S.A.* 40A:14–118 is the legal descendent of *L.*1917, *c.* 152, Art. XVI, § 1, and provides:

The governing body of any municipality, by ordinance, may create and establish a police department and force and provide for the maintenance, regulation and control thereof, and except as otherwise provided by law, appoint such members, officers and personnel as shall be deemed necessary, determine their terms of office, fix their compensation and prescribe their powers, functions and duties and adopt and promulgate rules and regulations for the government of the department and force and for the discipline of its members.

The below-quoted part of *N.J.S.A.* 40A:14–122 is legally descended from § 3 of the same act and provides:

The appointing body, officer or officers of the municipality when authorized so to do, may employ such officers and other personnel for said police department and force as temporary employees in emergencies, or for certain specified parts of the year, as needed.

Likewise is *N.J.S.A.* 40A:14–146 traceable directly to § 7 of the 1917 law and provides:

The governing body of any municipality, whenever they shall deem it necessary, may appoint special policemen for terms not exceeding one year and revoke such appointments without cause or hearing. They shall not be members of the police force, and their powers and duties shall cease at the expiration of the terms for which they were appointed or upon revocation of their appointments. They may be furnished with badges upon the deposit of sums to be fixed by the governing body, which may be refunded on the return of the badges. A fee to be fixed by the governing body may be charged for issuing to any such special policeman a certificate of appointment.

Those appointed to the police force of the municipality as "permanent" under *N.J.S.A.* 40A:14–118, or "temporary" under *N.J.S.A.* 40A:14–122, are members of the department. "Specials" under *N.J.S.A.* 40A:14–146, are not. Nowhere does the Legislature precisely define what it meant by the three classifications. Obviously a difference is intended.

Much of the difficulty in resolving the issues presented here comes into focus when one asks, "What is a policeman?" The average citizen of our day (for whose protection and service the policeman is hired) would agree that a policeman does and is expected to do many things. He does and is expected to fill many roles.

A "policeman" in real life does many things, varying from protecting children at school crossings to capturing crazed killers, to talking potential suicides down from a bridge. A policeman on duty may answer the telephone in police headquarters, shoot it out with bank robbers or run the risks of an undercover

investigation of organized narcotic trafficking. A policeman may wear an easily recognizable uniform or not. He may carry lethal weapons or not.

This modern concept of a policeman is one which has evolved. It was not always so. We are told that the first organized police department was that of the City of London, created in 1829 through the Parliamentary efforts of Sir Robert Peel. The word "police" itself is misunderstood. It means, as a noun, "The regulation and control of the affairs of a community, especially with respect to the maintenance of order, law, health, morals, safety and other matters affecting general welfare." *The American Heritage Dictionary of the English Language* (1969). A building inspector, a health officer, a municipal garbage collector would each be members of the "police" under that definition. *Black's Law Dictionary*, (4 ed. 1951), at 1316, cites the following to define the word "police":

> The police of a state, in a comprehensive sense, embraces its whole system of internal regulation, by which the state seeks not only to preserve the public order and to prevent offenses against the state, but also to establish for the intercourse of citizen with citizen those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own, so far as is reasonably consistent with a like enjoyment of rights by others. Cooley, Const.Lim. *572. It is defined by Jeremy Bentham in his works: "Police is in general a system of precaution, either for the prevention of crime or of calamities. Its business may be distributed into eight distinct branches: (1) police for the prevention of offenses; (2) police for the prevention of calamities; (3) police for the prevention of epidemic diseases; (4) police of charity; (5) police of interior communications; (6) police of public amusements; (7) police for recent intelligence; (8) police for registration." *Canal Com'rs v. Willamette Transp. Co.*, 6 Or. [219] 222.
>
> The term "police" has also been divided into "administrative police", which has for its object to maintain constantly public order in every part of the general administration, and "judiciary police" which is intended principally to prevent crimes by punishing the criminals. Its object is to punish crimes which the administrative police has not been able to prevent. *Green v. City of Bennettsville*, 197 S.C. 313, 15 S.C.[E.]2d 334, 337.

It must be recognized, then, that the term "policeman" is most broad generically and is of no help in determining what the Legislature intended by its three-fold classification.

What the public means by the word and expects when it perceives someone wearing the distinctive uniform and weapons of a "policeman" is a trained professional in the field of citizen

protection and the enforcement of criminal and quasi-criminal laws. It is that public perception which I find guided the Legislature in its three-fold classification.[1]

All of the parties are aware of, and to some extent rely upon, Attorney General's Formal Opinion No. 22, 1977, which is published in 101 *N.J.L.J.* 1, the issue of January 5, 1978. It deals with the permissible use of "specials." The following language from it is pertinent:

> . . . Accordingly, there is a further legislative indication that special police officers should not be used to perform on a full or parttime basis the usual and ordinary responsibilities of a regular member of a municipal police department.
>
> It is apparent that it is the underlying legislative purpose to allow for the use of special police officers to provide intermittent or temporary assistance to the regular police force during unusual or emergency circumstances. This would not by definition include responsibilities coincident with those of regular police personnel. The use of special police officers as dispatchers or for other limited police responsibilities on a regular basis would be impermissible. Similarly, special police officers may not be used for spectator and traffic control or for other police related activities in the absence of unusual or emergency circumstances which require assistance to the regular police department. On the other hand, the use of special police officers for intermittent or unusual crowd control or traffic direction or to provide extra security as a supplement to the regular police force in individual cases would be appropriate. An unusual condition would include an unpredictable event such as a natural disaster, riot or major fire. It would also include a predictable circumstance which requires extraordinary temporary assistance to the regular police force in individual cases, such as the use of special police during the summer at a resort community to handle the seasonal influx of visitors, to direct heavy traffic and handle large crowds at regularly scheduled sporting events and rock concerts.
>
> .    .    .    .    .    .    .    .
>
> In conclusion, therefore, special police officers should not be appointed by municipalities to perform the regular responsibilities of a municipal police department on a continuous basis or on a full or part-time basis. This would include general police work, police dispatching and routine traffic and crowd control. Special police, on the other hand, may be appointed to serve on a temporary or intermittent basis for emergent or unusual conditions, to supplement the regular police department for traffic and crowd control and/or to provide extra security at summer resorts, parades, sporting events, riots, natural disasters and for other similar purposes.

---

[1]See The President's Commission on Law Enforcement and Administration of Justice *Task Force Report: The Police* (1967); Rubenstein, *City Police* (1973).

Underlying all distinctions between "regular" and "special" officers is the question of training. On-the-job training may have been sufficient in the late 19th and early 20th Centuries. If so, it no longer is. The demands made upon any citizen expectations of a police officer now mandate formal training. The Legislature established the Police Training Commission in 1961. *N.J.S.A.* 52:17B–66 *et seq.* As originally enacted, *N.J.S.A.* 52:17B–68 provided for permissive training of officers before their appointment as members of the police department. In 1967 the Legislature made that requirement mandatory. *N.J.S.A.* 52:17B–68 now reads:

> Every municipality *shall* authorize attendance at an approved school by persons holding a probationary appointment as a police officer, and every municipality *shall* require that no person shall hereafter be given or accept a permanent appointment as a police officer unless such person has successfully completed a police training course at an approved school; provided, however, that the commission may, in its discretion, except from the requirements of this section any person who demonstrates to the commission's satisfaction that he has successfully completed a police training course conducted by any Federal, State or other public or private agency, the requirements of which are substantially equivalent to the requirements of this act. [Emphasis supplied]

The legislative intent is expressed clearly in *N.J.S.A.* 52:17B–66:

> The Legislature of New Jersey hereby finds and declares that a serious need for improvement in the administration of local and county law enforcement exists in order to better protect the health, safety and welfare of its citizens; that police work, a basic adjunct of law enforcement administration, is professional in nature, and requires proper educational and clinical training in a State whose population is increasing in relation to its physical area, and in a society where greater reliance on better law enforcement through higher standards of efficiency is of paramount need; that the present need for improvement can be substantially met by the creation of a *compulsory* educational and training program for persons who seek to become permanent law enforcement officers wherein such persons will be required, while serving in a probationary capacity prior to permanent appointment, to receive efficient training in this profession provided at facilities selected, approved and inspected by a commission created for such purpose; and that by qualifying and becoming proficient in the field of law enforcement such persons shall individually and collectively better insure the health, safety and welfare of the citizens of this State in their respective communities.

The Commission has no jurisdiction over "special" officers, but it is and has been keenly aware of the type problem illustrated by this case where "special" officers perform work generally contemplated as more fittingly done by "regulars." State-wide surveys as to the use of "specials" have been conducted. As a

result of recommendations made by the Commission, legislation mandating training for "specials" was introduced in the 1970 Legislature but not acted on. As part of a comprehensive report to the Governor by the Commission, dated January 7, 1977 and entitled "Standards for the New Jersey Municipal and County Police System—A Plan of Action," the Commission made recommendations for the mandatory training of special police, among others.

The PBA and the borough each have a stake in the outcome of this litigation. Theirs is primarily fiscal. The public, *i. e.*, the citizens of Belmar and the summer visitors, have a far more basic interest—their safety. It is fair to assume that citizens are assured by the visible presence of armed men in uniform that laws will be enforced and their safety protected. Underlying that feeling is the assumption that the armed, uniformed policeman knows his job—is a trained professional. To the extent that members of a municipal police force now receive mandated minimum training, that confidence is justified. In the case of a "special" it is not. Some "specials" because of years of experience may indeed be highly qualified professionals; others may be complete neophytes. All wear the same uniform, carry weapons and look the part. All, seemingly, have the right to exercise those sensitive powers of arrest accorded to a member of the force. *See State v. Doyle*, 42 *N.J.* 334, 349 (1964); *State v. Morse*, 54 *N.J.* 32, 35 (1969). Such public confidence is not justified. The potential for very real harm is clear.

Therefore, the following resolution is made.

If the borough wishes to hire personnel to check parking meters, cross pedestrians over busy streets and act as watchmen in the beach area it may, of course, do so subject to Civil Service requirements. *See State v. Jones*, 4 *N.J.Super.* 599, 607–8 (Law Div.1949), rev'd on other grounds 4 *N.J.* 207, rearg. den'd 4 *N.J.* 374 (1950). If it wishes to uniform those people in a distinctive fashion it may do so. If it wishes to call them special policemen, the Legislature has accorded it that power, but wisdom indicates that in order not to mislead the public they be designated by a

term such as "guards" or any name other than "policeman." If the borough wishes to equip them with walkie-talkies for direct and ready contact with the police force, it would be prudent to do so. But the borough may not issue them weapons, or handcuffs or nightsticks or slapjacks. Therein lies the potential for real harm in the hands of nonprofessionals. Neither may such persons exercise powers of arrest beyond those accorded any other citizen. Experience proves that the moment of arrest is probably the most critical and dangerous in police work. The power to deprive another of liberty is so awesome in our society as to cause, in many cases, an extreme and violent reaction on the part of the arrestee. The decision to arrest or merely to issue a summons, to decide on the manner of arrest so as to keep force and violence to a minimum, requires the exercise of a sensitive discretion best left to a trained professional.

If the borough wishes to expand regular police protection for the summer, the desire is commendable but regulars must be used. Thus, the patrol of the business district is regular police work and a "special" may not be assigned. The extra man in a police patrol car is on duty for regular police work and a "special" may not be assigned. It is these regular officers who would be expected to respond to the emergent calls of the summer "specials" on duty.

If the borough wishes to expand its police department for the summer, it has the power to hire temporary members of the police department pursuant to *N.J.S.A.* 40A:14–122. As members of the police force they are accorded equal powers when serving as part of the police department and force. *N.J.S.A.* 40A:14–152. Necessarily, equal training would be required of them before they could receive such appointment. *N.J.S.A.* 52:17B–68. The word "permanent" as used in that provision does not militate against the conclusion for when read in conjunction with the purposes of the Police Training Act (*N.J.S.A.* 52:17B–66, above) and with *N.J.S.A.* 40A:14–122 making these temporary officers members of the police department during their time of service, they must be trained.